EDWARD R. THOMAS

*v.*

INTERNATIONAL SILVER COMPANY et al.

[Decided January 11th, 1907.]

1. A corporation, by pledging its own stock as collateral to another corporation, cannot empower the pledgee corporation to exercise a power or incident of ownership which the real owner does not possess.

2. Evidence examined, and *held* to show a pledging of stock, not made in good faith for the purpose of affording additional security for loans, but for the purpose of placing the stock in the hands of those friendly to the existing management, in order that it might be voted on to retain them in power, and thus avoid the letter and spirit of the prohibition contained in the thirty-eighth section of the General Corporation act of this state. *P. L. 1896 p. 277.*

*Mr. Robert H. McCarter,* attorney-general, and *Mr. Otto Hess* (of the New York bar), for the complainant.

*Mr. John W. Griggs* and *Mr. Graham Sumner* (of the New York bar), for the defendants.

BERGEN, V. C.

The United States Silver Company is the owner of ninety-three thousand shares of the common and five thousand shares of the preferred stock of the International Silver Company, and the latter company owns all of the capital stock of the United States Silver Company, and controls, through such ownership, its management. The direct result intended by this arrangement is the voting of the shares of the International company, registered in the name of the United States company by the officers of the International company for such persons as they may desire to continue in, or appoint to, the management of their company, the directors of the United States company being also directors of the International company. The testimony shows that all of the capital stock of the United States Silver Company was purchased by, and now belongs to, the International company, although some of the shares stand in the names of the officers of the International company for the purpose of qualifying them as directors. That the International company is the real owner of the stock, and that its officers should not be allowed to exercise the voting power usually incident to stock ownership, either directly as owners, or indirectly through its control of the United States company, seems to me very clear, and their right to vote the stock was not seriously pressed on behalf of the defendants on the argument. No substantial change in the situation upon this branch of the case has occurred since the matter was passed upon by the court of errors and appeals in *O'Connor* v. *International Silver Co.,* 68 *N. J. Eq.* (*2 Robb.*) *680,* and the argument for the defendants was based upon the assumption that, in equity, the International company was the owner of the stock. The present controversy arises over the right claimed by certain pledgees, to whom the stock has been assigned in pledge as collateral for the

debts of the International company, to vote at the next annual meeting of that company for the election of officers. The evidence shows that just previous to the filing of the bill of complaint by O'Connor, the stock owned by the United States company was transferred to several banks and trust companies as collateral security, in some cases for loans already made to, and in others for loans expected by, the International company. The present proceeding looks to an injunction preventing the pledgees from voting on the hypothecated stock held by them respectively, which in each case was regularly transferred to them on the books of the International company, the transfer expressly empowering each pledgee to vote thereon.

The first question presented is, can a corporation, by pledging its own stock as collateral to another corporation, empower the pledgee corporation to exercise a power or incident of ownership which the real owner does not possess? Section 38 of the Corporation act of this state declares "shares of stock of a corporation belonging to said corporation shall not be voted on directly or indirectly," and if by pledging stock as collateral security the directors of a corporation can endow the stock with a virtue it does not possess in the hands of the real owner, and the disqualification of the pledgor to vote the stock does not extend to the pledgee, it would appear that in every case where a corporation is the owner of its own stock a ready method is provided by which the officers of a corporation desiring to perpetuate themselves in office can bring about that result, and it should not be allowed unless the law plainly requires it, because it is in effect an indirect way of voting the stock. According to section 37 of the same act the pledgor may represent his stock at all meetings and vote thereon as a stockholder, "unless in the transfer to the pledgee on the books of the company he shall have expressly empowered the pledgee to vote thereon." The right to vote on stock pledged as collateral remains, under our law, with the pledgor, unless by his act he shall empower the pledgee to vote thereon. The transaction is a contract between the parties, settling as between them who shall exercise the voting power incident to the ownership of the stock. It is in its nature a proxy given by the pledgor to the pledgee to repre-

sent the voting power of the owner, and may be revoked by the pledgor at any time by redeeming his pledge. That the directors may sell the stock and thereby restore its voting power, does not meet the question, for an absolute sale of the stock deprives the pledgor of any right in, or control over, the stock, it is not subject to redemption, and the real owner in such case takes the voting power, not by way of contract or proxy, but as a right incident to his ownership. To interpret our statute otherwise would open the door to a constant evasion of the law which prohibits directors from voting, directly or indirectly, on the stock of their own company, because temporary loans could always be made by them just prior to the annual election, and the stock pledged with a voting power to persons known by the directors to be friendly to their aspirations.

My conclusion is, that under our law whenever the owner of stock is disqualified to vote it, that disqualification is not removed by simply hypothecating the stock as collateral for a loan, and that the right which the law gives to the pledgor to empower "the pledgee to vote thereon" is limited to such pledgors as are themselves possessed of the right to vote on the stock which they own, and that the pledgees in this case hold the stock of the International company subject to the same disqualification, so far as the power to vote thereon is concerned, as that which the statute imposes on the pledgor.

The second question presented is whether the pledging of this stock was made in good faith for the purpose of affording additional security for loans made to the International company, or for the purpose of placing the stock in the hands of those friendly to the existing management in order that it might be voted to retain them in power, and thus avoid the letter and spirit of the prohibition contained in our law. The evidence convinces me that the directors pledged this stock, not as security, but simply for the purpose of restoring to it a voting power that the pledgees might exercise in their interest. It was a palpable attempt to evade the law and to secure the benefit of the votes which the stock would represent in the hands of a duly-qualified owner. This stock had only a nominal value, and was intrinsically worthless as security independent of the fact

that it could have no possible value until the very debts it was given to secure had been liquidated, for all of the assets of the company which supported the stock would be first liable for the debts of the company, and if the assets would not so far extend then the stock would be absolutely worthless either to pledgor or pledgee.

We do not have to look very far to ascertain the motive of these directors. In March, 1904, a circular letter was mailed to all of the stockholders of the International company by three of its stockholders who claimed to be the largest individual holders of the stock of the International company, one of them being the complainant in this cause, requesting the attendance of stockholders at the next annual meeting, for the purpose of securing representation on the board of directors for such stockholders as were not either officers or managers of the company. A careful reading of the letter shows that there is nothing improper or unfair in its statements, nor does it indicate any motive other than a desire to bring about what they esteemed to be a more economical management of the company. Whether they were justified in their claim that the business could be conducted with greater economy than was then being exercised, I am not called upon to determine, but the right of stockholders largely interested, to appeal to their fellow-members of the company to attend the annual meeting and urge reforms and retrenchments in the management of the company, or if unable to attend the meeting to send a proxy that others might represent them, is not an act which the officers of a well-managed company ought to complain of or discountenance, and I cannot find in it any cause for the alarm which Mr. Rockwell, the president of the First National Bank of Meriden, Connecticut, said induced him to start a concerted movement by the banks to secure from the company a pledge of its own stock as collateral for its debts, existent and anticipated. It is not denied that up to this time the International company kept large balances in the institution to which the stock was afterwards pledged, and that its credit was sufficient for it to procure all necessary funds to carry on its business without giving any collateral, and as an effort by stockholders to reduce the expense of conducting the business

was not likely to injuriously affect its credit, I do not deem it necessary to analyze in detail the large amount of testimony taken in this cause. It is sufficient to say that it convinces me that the movement started by Mr. Rockwell, which resulted in the pledging of the stock in question, had but one real purpose, and that was to have the stock transferred with a voting power, to friendly parties who would exercise it in the interest of the directors of the International company, and thereby continue them in its management, and is but a thinly disguised scheme to have stock owned by the corporation voted upon indirectly. The evidence shows that Mr. Rockwell was a very intimate friend of Mr. Dodd, the president of the International company, and a brother of the secretary of that company; that upon the receipt of the circular letter to which I have referred, he went to New York City from Meriden, where the general office of the International company is located, and visited the officers of the American National Exchange Bank, the National City Bank, both of New York City, and of the Hackensack Trust Company, and arranged that those institutions should make a demand upon the International company for a pledge of its stock, being the banks and trust company which he knew were at times loaners of money to the International company, and told them that the bank he represented, as well as the Home National Bank, of Meriden, intended to demand a pledge of the stock of the International company, and suggested that they pursue the same course, in order, as he said, that they might be represented at the stockholders' meetings with a right to vote on the stock to be transferred to them. At the time of his visit to New York the American Exchange Bank had no claim against the International company, while the company then had on deposit with that bank a large balance, nor was there any debt owing at that time to the Hackensack Trust Company, but, on the contrary, the trust company was indebted to the International company for a considerable deposit balance. It is true that the International company was then a borrower from the National City Bank, and also from the two banks in Meriden, for which accommodation, however, the International company carried large balances. The transfer of this stock took place

about the 17th of March, 1904, at which time the indebtedness
of the company to the National City Bank was $50,000, while
its credit balance there was nearly $46,000; its indebtedness to
the Home National Bank was $40,000, while its credit balance
was nearly $63,000; its indebtedness to the First National Bank
being $20,000, while its credit balance was $15,000. Under
these circumstances, coupled with the fact that the Interna-
tional company had, up to that time, been considered by all
these financial institutions as solvent and entitled to a very
liberal credit, at the same time keeping generous balances with
each of them, and no change in their financial condition being
asserted, it is impossible to come to the conclusion that these
institutions were at all alarmed about the financial condition of
the company, and had no real desire to have the stock of the
International company pledged as security, beyond a willing-
ness to aid the persons in control of a profitable customer to
continue in power. The stock was taken, not because it was a
collateral of any value or as security, but in order, as it was
expected, to restore ·a suspended voting power to be exercised
on behalf of the officers of the company making the pledge.
That the officers, representing the pledgor and pledgee corpora-
tions, testify that no bargain was made regarding the persons
for whom the votes should be cast, and that the power of the
pledgee to vote as it pleased was not restricted by any agreement,
I am justified in inferring from the evidence that there was a
well-founded expectation on the part of the officers of the Inter-
national company that the pledgee would vote the stock in their
interest, and I have, no doubt, from the various efforts made by
the directors of the International company, as disclosed in this
case, to control the voting power of this stock, that if they were
at all doubtful as to the intention of either of these pledgees,
the pledge would have been promptly redeemed and hypothe-
cated with a more steadfast friend.

On this branch of the case my conclusion is, that these pledgees
are not *bona fide* holders of this stock as collateral for loans
made by them, but took it for the sole purpose of aiding in the
indirect voting of the stock of a corporation owned by the cor-
poration itself, and that the pledgees hold this stock in equity,

in trust for the International company, and without any real interest therein, and that to permit them to vote it would effect the very evil which the law intended to prohibit when it forbade the voting by the corporation of its own stock either directly or indirectly.

I will advise an injunction preventing the defendant pledgees from voting on the stock held in pledge.