ITALO PETROLEUM CORPORATION OF AMERICA, a corporation of the State of Delaware, and A. J. SCAMPINI,

*vs.*

PRODUCERS OIL CORPORATION OF AMERICA, a corporation of the State of Delaware, CHARLES P. MINNING, C. AL. LANDGREN, E. T. OFF, FRANK LOBER AND M. V. MC-QUIGG.

*New Castle, July 20, 1934.*

*Hugh M. Morris* and *Ivan Culbertson,* for petitioners.

*Howard Duane,* and *Charles S. Aromstram,* of New York City, (*Archie S. Karp,* of New York City, on the brief), for respondents.

THE CHANCELLOR: 1. Taking the allegations of the petition to be true, as we must on demurrer, enough is shown to demonstrate very clearly that the duly selected transfer agent of Producers deliberately contrived to keep Italo's name off the stock ledger long enough to disqualify it of record as a voter. Stock transferred within the period of twenty days before an election is disfranchised. *Moon, et al., v. Moon Motor Car Co., et al.,* 17 *Del. Ch.* 176, 151 *A.* 298. The transfer agent made captious and unwarranted objections to Italo's right to registration. That its objections were insincere and pretended is shown by the fact, as alleged, that when the disqualifying period of twenty days had begun to run the agent ceased to raise objections and agreed to make the transfer and registration. It has since been consummated.

Can it be that the managers of a corporation may disfranchise a stockholder by the simple contrivance of causing a transfer and registration to be withheld until the disqualifying twenty day period arrives? It may be granted that inspectors of election should be controlled exclusively by the record of the stock ledgers. But a court of equity will not be bound by any stock record which is built on such a flimsy foundation as the question just put suggests. The statute contemplates that in review proceedings such as this the court may enter upon a question of disputed ownership and determine who is the owner for voting purposes, the record ownership notwithstanding. If so, *a fortiori* the court could and should inquire if by a fraudulent device the owner, whose status as such is unquestioned, has been deprived of his record title by those who are interested, not to challenge his ownership, but solely to deprive him of its voting incident.

Assuming the facts to be as alleged, Italo by every principle of right should have been permitted to become a registered owner of its stock in advance of the twenty day period. This right was denied it by the management

which is charged, through its transfer agent, with having resorted to procrastinating pretenses and excuses that were fraudulently designed. If this court could not break through the thin appearances of a stock record that concealed that sort of situation, the review proceedings provided by *Section* 31 of the *General Corporation Law* (*Revised Code* 1915, § 1945, as amended by 35 *Del. Laws, c.* 85, § 15) would be nothing more than a mere auditing and recounting operation.

In this court Italo should be regarded as a stockholder of record. Its registration as such should have been permitted, and this court will regard as done that which should have been done in the matter.

2. The chairman of the meeting announced the presence in person or by proxy of stockholders representing 267,624 shares. This number did not include the shares of Italo. It did include the 135,009 shares registered in the name of Traders, the ninety-nine per cent. owned subsidiary of Producers. The other 132,615 shares present are not challenged. If Traders' stock had no right to vote, it becomes apparent that Italo, were its votes counted, would have controlled the meeting. Since that is so, it becomes necessary to consider the right of Traders' stock to be voted, for if it had the right, the result is manifestly safe from attack; and if it had not the right, the result should be rejected and a new election held.

The statute in *Section* 19 (*Revised Code* 1915, § 1933, as amended by 36 *Del. Laws, c.* 135, § 10) provides that corporations may purchase and hold shares of their own capital stock; but that "shares of its own capital stock belonging to the corporation shall not be voted upon directly or indirectly * * *."

If the shares held by Traders had stood in the name of Producers itself, they could not of course have been voted. They were not so held, however. They were held by Traders which is owned almost entirely by Producers. It is con-

tended by the petitioners that the 135,009 shares held by Traders should in equity be regarded as "belonging" to its ninety-nine per cent. owner, Producers; and that so belonging those shares could not by virtue of the statutory provision be voted.

The statute prevents the voting either directly or indirectly by a corporation of its own stock belonging to it. What can "indirectly" mean unless it be some such thing as having stock belonging to the corporation held in some third party's name and having that third party vote it? It requires some moments of reflection to discover any other possible device of indirection which the corporation could conjure up. The thought I have given to the matter, which I confess has not been lengthy, has failed to suggest any other. There may be other methods. But the one suggested is so obvious that it is reasonable to suppose that it certainly was dominant in the legislative mind when the section was enacted.

There can be no doubt that if a corporation acquired its own stock and caused it to be held in the name of an individual who would vote it as ordered by the corporation's directors, the vote of the individual would be the vote, indirectly given, of the corporation. Nor can there be any doubt that if a corporation planned to buy its own stock and its directors, desiring to vote that stock in violation of the statutory inhibition, organized a wholly owned subsidiary to hold the stock and vote it, the scheme would prove abortive. It would be so crude as to lack even the merit of cleverness. The fiction of the corporate entity would in that case be brushed aside and the device unhesitatingly pronounced but a mere scheme for the indirect voting by the corporation of its own stock in violation of the statute. Professor I. Maurice Wormser, of Fordham University Law School, in the collection of articles written by him and published under the title "The Disregard of the Corporate Fiction and Allied Corporate Problems" (1927),

apparently inclines to the view that, generally speaking, a wholly owned subsidiary holding its parent's stock ought to be permitted to vote it. But if the case were such as I have above put, he is of the view that the general rule should not apply.

"It follows," he says on page 100 of his book, "that if Corporation B were organized, or the stock transfer made, * * * * solely in order to achieve certain vicious and fraudulent results, the corporate fiction properly might be disregarded, and the shares of Corporation B, accordingly, could not be voted. In the absence of such proof, however, it seems clear that the shares could be voted."

At another point in his discussions (page 97) he expresses the view that the "doctrine of separate existence may be carried too far, and it is properly disregarded in cases of fraud, statutory circumvention, public wrong, and like instances."

The extent of Producers' ownership of Traders is large. It is ninety-nine per cent. It may as well be called one hundred per cent. The petition alleges that Traders "is wholly and completely controlled, dominated and managed by Producers." It would be anomalous if it were not. A ninety-nine per cent. interest is not likely to allow the other one per cent. interest to assume management and control. That Producers regarded its stock which Traders held as stock belonging to itself is manifest from the fact, alleged in the petition, that Producers carried the stock held by Traders in its financial statements as treasury stock. This method of treating it is consistent only with ownership by Producers. Producers appears to have entertained the notion that the stock held by Traders belonged to Traders in its own status of a separate corporate entity and not to Producers only when a movement made its appearance to elect directors in opposition possibly to the incumbents.

It seems to me to be carrying the doctrine of distinct corporate entity to an unreasonable extreme to say that,

in a contest over control of a corporation those in charge of it should be allowed to have votes counted in their favor which are cast by a subsidiary stockholder wholly owned, controlled, dominated and therefore dictated to, by themselves as the spokesmen of the parent. The directors of Producers do not own Traders. It is owned by Producers which in the last analysis means by Producers' stockholders. As Producers' stockholders are in a very material sense the equitable owners of Traders, it follows that in a like sense they are the ultimate owners of Traders' assets. Yet, if the contention of the respondents be accepted, strangers to their ownership can, because of the legal conception of corporate entity, so interpose themselves as to use that very ownership as a means of depriving its equitable possessors of their rights of control over their own corporation.

The proposition seems to me to be thoroughly indefensible. It may be that there are cases where it would be right that an owned subsidiary should be allowed to vote its parent's stock. If so, in my judgment those cases should rest on an exceptional state of facts. Rather than accepting as the general rule the view that the subsidiary should be permitted to vote unless the circumstances be exceptional, which is the view that Professor Wormser takes, it seems to me the safer view to take and the one more likely to accord with what is just, is that as a general rule the subsidiary should be disqualified and, if a particular case is exceptional, the burden should be on those who assert it to show it.

What little of judicial authority there is bearing on the precise question here under discussion, supports the views herein expressed. In New Jersey the question has arisen and was decided against the right of the subsidiary to vote; and the denial is not qualified by the language of the deciding court by the recognition of any possibility of exceptional cases. The question first arose in that State

in 1904 before Vice-Chancellor Pitney in the case of *O'Connor v. International Silver Co.*, 68 *N. J. Eq.* 67, 59 *A.* 321. The Vice-Chancellor concluded after an ably written discussion, to which I am content to refer without reviewing, that under the New Jersey statute, which is similar to ours, officers and directors of a corporation which has acquired some of its own stock by the purchase of all the capital stock of another corporation owning it, are precluded from voting on the shares so acquired at a meeting of the stockholders for the purpose of electing directors.

The decision by the Vice-Chancellor was carried to the Court of Errors and Appeals and there affirmed, 68 *N. J. Eq.* 680, 62 *A.* 408. But, it is said, as the Court of Errors and Appeals stated that it preferred to rest its affirmance upon reasons different from those advanced by the Vice-Chancellor, the views of the latter were repudiated by the appellate tribunal. If the Vice-Chancellor's reasoning was meant to be repudiated, the Court of Errors and Appeals did not say so. Why it preferred to have the case turn on the reasons given by itself, the opinion does not state and we have no means of knowing. Certainly it is an unwarranted conclusion to draw, to say that it preferred its own reasons because those of the Vice-Chancellor were unsound.

It is of interest to note that another aspect of the same case, with some change of circumstance, came again before the Court of Chancery of New Jersey in 1907, when Vice-Chancellor Bergen according to the report as I read it, apparently accepted the views expressed by Vice-Chancellor Pitney in the earlier case. *Thomas v. International Silver Co.*, 72 *N. J. Eq.* 224, 73 *A.* 833.

The case of *Lazenby v. International Cotton Mills Corp.*, 174 *App. Div.* 906, 160 *N. Y. S.* 1, affirmed 226 *N. Y.* 645, 123 *N. E.* 875, is cited in support of the proposition that a wholly owned subsidiary may vote stock of the parent held by it. That case was first heard before a referee whose findings and conclusions were accepted by the Appellate

Division as satisfactory except as to a matter not relevant to the point here involved. It appears from *Cases and Points on Appeal, Appellate Division Cases (N. Y.) First Department, 1916, Vol.* 2725, that the referee held that stock held by a subsidiary corporation in the corporation controlling it should be allowed to be voted upon the question of the dissolution of the latter. It is said by the solicitors for the respondents that the acceptance by the Appellate Division of the referee's report and the affirmance by the Court of Appeals, constitute an endorsement by the New York courts of the referee's opinion upon the legal proposition just stated as among his conclusions. If that is true, it appears only by inference. The record of the case was a voluminous one and its nature was such that it is easily apparent that legal propositions other than the particular one just referred to as stated by the referee may well have been controlling in the conclusions of the Appellate Division and the Court of Appeals. I am far from satisfied that the reviewing courts in the New York case approved as sound the proposition of the referee as a ruling one in a case of the instant type.

3. It is further objected by the respondents that there is no jurisdiction in the court to pass upon the question of whether the vote of Traders was properly accepted at the meeting, because Traders is not a party to the cause. This question is sufficiently answered by the opinions of the Supreme Court in *Standard Scale & Supply Corp. v. Chappel, et al.,* 16 *Del. Ch.* 331, 338 *et seq.,* 141 *A.* 191, and in *Triplex Shoe Co. v. Rice & Hutchins, et al.,* 17 *Del. Ch.* 356, 373, 374, 152 *A.* 342, 72 *A. L. R.* 932. The first cited case is sought to be distinguished because the stock ledger showed the voter to be a stockholder and when he became such, whereas here the stock ledger shows the alleged voter not to be a stockholder. How that difference of fact bears on the question of whether the stock-holder-voter is an indispensable party I cannot see.

4. Of the shares owned by Traders, 50,000 were in the name of Citizens Bank and Trust Company as pledgee. The statute (*Section* 18 [*Revised Code* 1915, § 1932, as amended by 36 *Del. Laws, c.* 135, § 9, as amended by 37 *Del. Laws, c.* 129, § 6]) provides that stock registered in the name of a pledgee shall be voted by the pledgor unless in the transfer on the books he shall have expressly empowered the pledgee to vote thereon. So far as appears, there was no express authorization to the pledgee to vote the stock registered in its name. The 50,000 shares are then for voting purposes a part of the Traders' holdings.

5. The respondents contend that even if the stock held by Traders should not have been permitted to vote, yet it should have been allowed to be counted for quorum purposes. *Doig v. Port Edward Townsite Co., Ltd.,* 22 *British Columbia Reports,* 418, decided in 1916, is cited by the petitioners against this contention. That case holds that under a statute providing that three members must be personally present to form a quorum, if the business to be done is a voting business the three members must be voting members.

In this State there is no statutory provision specifying the number of stockholders necessary for a quorum. The matter is governed by the by-laws. The by-law provision is—"a majority of the stock issued and outstanding shall constitute a quorum, and all questions shall be decided by a majority of the votes cast." It is somewhat of an anomalous situation, not to say curious, if stockholders may help form a quorum for the transaction of business when they cannot participate in the decision of the business which the quorum is convened to transact. The court in the case from the British Columbia report, while holding that non-voters could not help make a quorum for voting business, yet held that they could help make one to transact non-voting business. The first half of the holding is understandable. But the last half is beyond my grasp, for I cannot conceive of

what "non-voting business" can embrace. The transaction of business presupposes action by the meeting. Action imports an expression of assent by the participating members, and the expressing of assent necessarily imports what is conveniently called voting in some form or other. What then can the transaction of non-voting business mean?

Notwithstanding what appears to be the unacceptability of the rather puzzling idea which the last half of the ruling of the British Columbia court expresses, I am of the opinion that the first half is acceptable, viz., that members present for quorum purposes must be voting members, that is to say members who are qualified to participate in the business which the quorum is convened to transact. The by-law language in providing that decisions shall be made by a majority of the votes cast, hooked up as it is by the copulative conjunction with the quorum definition, is persuasive that the quorum members must be voting members. Not only so, but the reason of the thing, aside from any peculiarity of language in the by-law, suggests that it should be so.

It is argued by the respondents that if a quorum must be made up of voting members, practical difficulties in the way of holding meetings will arise. Suppose, it is said, a corporation owns a subsidiary which owns a majority of its parent's stock. In that case, it is said, no quorum could ever be convened and the present management would stay in control *in perpetuam*. The suggested difficulty does not appear as insuperable to me as it does to the respondents. But the case does not call for a consideration of possible solutions of the suggested difficulty.

What has been said under this fifth head of the discussion might well have been left unsaid, for after all, if the Italo stock should be regarded as having a right to be treated as present at the meeting, as I have indicated it should, the quorum was complete without regard to Traders' stock. But I have chosen to treat the case as possessed of

alternative aspects and, so treating it, have concluded that in either of its alternatives the results of the meeting should be disregarded and a new one convened. This is on the assumption of course that the allegations of the petition can be established by proof.

6. The case presented by the petition is not to be regarded as one that must rest on only one of several detached episodes of fact which the petition relates, without supporting aid from the others. It is entitled to rest for its support on the combined strength of all the episodes. So viewing it, what does the petition show? It shows that the management of this corporation either refused or neglected to call the regular annual meeting. When Italo took steps to have its large holdings re-registered in its name and made demand for the convening of the defaulted meeting, it was met by groundless evasions and excuses which resulted eventually in its technical disfranchisement as a voter at the meeting which had in the interval been called. It was refused recognition at the meeting and such use was sought to be made of the stock held by Traders which the management of Producers controlled and dominated and whose stock in turn was in point of ultimate right owned by the stockholders of Producers, as to keep the management in control and at the same time, by amendment of the by-laws, to so arrange the terms of directors that the present management would be in safe control for a year after the next annual meeting in 1935. Thus, if opposition to the management should show a majority in 1935, the management by its conduct in 1934 would be safely in possession of the directorate and offices for another year after dissatisfaction with it had been manifested by a majority.

Taking all of those facts together, the case shown by the petition is very clearly one where officers and directors are alleged to have done things in the exercise of their official powers solely in the interest of continuing themselves in control.

I repeat for the sake of emphasis what has before been said more or less incidentally, that what has been referred to herein as facts must be understood simply as being the assertions of the petitioners. Whether or not the facts as detailed by the petitioners can be substantiated, remains to be seen at a later stage of the case when proof is in order.

The demurrer will be overruled.