The COMMITTEE FOR NEW MANAGE-MENT OF GUARANTY BANCSHARES CORPORATION, Richard A. Ehst, and Elwood A. Reppert

v.

William R. DIMELING and Guaranty Bancshares Corporation.

Civ. A. No. 91–0253.

United States District Court, E.D. Pennsylvania.

July 29, 1991.

James Wiles, Wayne, Pa., for plaintiffs.

Stanley Yovsz, George Nagle, Pittsburgh, Pa., for defendants.

## OPINION

CAHN, District Judge.

In this securities action, the plaintiffs have alleged that the defendants committed fraud in connection with a proxy contest held in December, 1990. The plaintiffs seek to be installed on the Board of Directors of Guaranty Bancshares Corporation ("Guaranty"). The court has held a number of evidentiary hearings, and the parties have submitted pre- and post-trial briefs. Upon consideration of the evidence introduced at the hearings and the briefing of the parties, I make the following

### I. FINDINGS OF FACT[1]

A. *The Parties*

1. The plaintiffs are:

a. The Committee for New Management of Guaranty Bancshares Corporation ("Committee"), an association in fact comprised of the following shareholders of Guaranty Bancshares Corporation:

(1) Richard A. Ehst, a resident of Easton, Pennsylvania, and beneficial owner of 100 shares of common stock ("shares") in joint tenancy with Elwood A. Reppert. Ehst is also a Committee nominee for the Guaranty Board of Directors ("Board").

(2) Marjorie M. Ehst, a resident of Easton, Pennsylvania, and, as of December 12, 1990, beneficial owner of 100 shares indirectly through her husband, Richard A. Ehst.

---

**1.** These findings of fact are drawn from testimony heard during the hearings for preliminary injunction and entry of final judgment. Further findings are drawn from the parties' exhibits. The court has also drawn inferences of fact from the evidence before it. Citations to hearing transcripts ("Tr.") are cited with reference to the date of the testimony, and exhibits are cited as Plaintiffs' ("P-__") or Defendants' ("D-__") respectively.

(3) Elwood A. Reppert, a resident of Wyomissing, Pennsylvania, and beneficial owner of 1500 shares, 100 of which are owned in joint tenancy with Richard A. Ehst. Mr. Reppert is also a Committee nominee for the Board.

(4) Lise M. Reppert, a resident of Wyomissing, Pennsylvania, and, as of December 12, 1990, beneficial owner of 1,500 shares indirectly through her husband, Elwood A. Reppert.

(5) Daniel J. Shaffer, a resident of Reading, Pennsylvania and beneficial owner of 100 shares in joint tenancy with his spouse, Ann Shaffer. Mr. Shaffer is also a Committee nominee for the Board.

(6) Ann Shaffer, a resident of Reading, Pennsylvania, and beneficial owner of 100 shares in joint tenancy with her spouse, Daniel J. Shaffer. P-12.

b. Richard A. Ehst, individually, as a member of Committee and a Committee nominee for the Board. *Id.*

c. Elwood A. Reppert, individually, as a member of Committee and a Committee nominee for the Board. *Id.*[2]

2. The defendants are:

a. William R. Dimeling, Chairman of the Board of Guaranty Bancshares Corporation at all times relevant hereto. Tr. (1/25/91) at 194:10-14. Mr. Dimeling resigned his position at some time after the inception of the lawsuit.

b. Guaranty, a Pennsylvania domestic business corporation, incorporated on July 19, 1984, and as amended in its articles of incorporation on April 29, 1985. Guaranty is located at 1631 Locust Street, Philadelphia, Pennsylvania. P-46.

B. *The 1990 Annual Shareholders Meeting and Election of Board of Directors ("Annual Meeting")*

3. On February 22, 1990 the Guaranty Board scheduled the Annual Meeting for April 18, 1990. P-38.

4. Thereafter the Board canceled the April 18, 1990 meeting.

5. On November 14, 1990 Guaranty reported to the Securities Exchange Commission that the Board had scheduled the Annual Meeting for December 27, 1990. P-5.

6. On November 20, 1990 Guaranty entered into a Memorandum of Understanding (M.O.U.) with the Federal Reserve Bank which required, in part, that Guaranty (1) hold its Annual Meeting by December 31, 1990, (2) notify the Federal Reserve Bank of any proposed addition to the Board at least 30 days before the anticipated addition, and (3) submit any Board additions to the Federal Reserve Bank for approval. P-8.

7. Guaranty established November 21, 1990 as the record date for the Annual Meeting. P-12.

C. *The Proxy Contest*[3]

8. On or about December 3, 1990, Guaranty mailed notice of the Annual Meeting and definitive proxy materials to shareholders. P-11.

9. The Guaranty proxy materials included a white proxy card. By signing the card, a Guaranty shareholder could appoint William R. Dimeling, Richard A. Schreiber, and John C. Tuten, Jr. as proxies to vote, in the shareholder's place, in accordance with his or her instructions as they appeared on the card.

10. The nominees of the Board of Directors ("the management slate") were: William R. Dimeling, David W. Marston, Jack D. Moran, Richard R. Schreiber, John C. Tuten, Jr., and Terry L. Moll. D-2.

11. On December 6, 1990 Committee submitted to Guaranty its "Shareholder Demand for Inspection of Shareholder List" for the stated purpose of soliciting proxies for the annual meeting. P-7.

---

**2.** The other participants in the Committees campaign for control of Guaranty are Michael Ciriaco, Raymond L. Croft, and Nicholas H. LaMotte. Each is a shareholder of Guaranty, and each is a Committee nominee for the board.

**3.** The defendants objected to the admission of "extrinsic evidence" to clarify the meaning of the disputed proxies. I admitted the evidence over the defendants' objection. However, I found it unnecessary to rely on the evidence objected to by the defendants.

12. On December 11, 1990 Guaranty refused Committee's request, stating that Guaranty had no knowledge of whether Committee had complied with the terms of the M.O.U. regarding additions to the Board of Directors. P-8.

13. On December 13, 1990 the Court of Common Pleas, Philadelphia County, at Committee's request, granted a "Temporary and Summary Order for Inspection of Shareholder List Materials." P-10.

14. Committee commenced solicitation of proxies on December 18, 1990. Tr. (1/25/91) at 29.

15. The Committee proxy cards, which were green, appointed Richard A. Ehst, Daniel J. Shaffer, and H. Anderson Ellsworth as proxies to vote, in the shareholder's place, in accordance with his or her instructions as they appeared on the card. P-27.

16. The Committee nominees for the Board ("the insurgent slate") were Michael Ciriaco, Raymond L. Croft, Richard A. Ehst, Nicholas H. LaMotte, Elwood A. Reppert, and Daniel J. Shaffer. P-27.

17. The front of the green Committee proxy card contains the following language:

**Other Business:** In their discretion, the proxyholders are authorized to vote upon such other business as may properly come before the meeting.

P-27.

18. On December 19, 1990, Guaranty mailed a supplemental solicitation of proxies in response to Committee's solicitation. P-14, 45.

D. *The Disputed Shearson Lehman Brothers Proxies*

19. Shearson Lehman Brothers ("Shearson") is a securities broker/management firm that holds Guaranty shares in its own name, although the owners of the shares are Shearson's clients. Tr. (1/25/91) at 33:19–25.

20. On December 12, 1990, before it knew that a contest existed, Shearson issued a white proxy card giving the Guaranty proxyholders authority to cast 108,500 votes at their discretion. P-23, 28.

21. On December 26, 1990 Shearson issued a white proxy card ("the December 26th white proxy") authorizing the management proxyholders to cast 17,450 votes for the management slate and for propositions 2 and 3. The card also granted the proxyholders authority to cast 17,-450 votes on any other matters coming before the meeting.

22. Shearson's December 26th white proxy is stamped "REVOKES PRIOR PROXY." A notation on the face of the card, generated by a facsimile machine, indicates that a facsimile of the card was transmitted on December 26, 1990 at 4:20 p.m. P-28.

23. On December 26, 1990 Shearson/Lehman issued a green proxy card authorizing the Committee proxyholders to cast 91,100 proxy votes for the Committee nominees and for propositions 2 and 3. P-2.

24. The Shearson proxies were not identical and they did not conflict with each other. The judge of elections acknowledged at trial that the cards are not inconsistent. Tr. (1/25/91) at 101:1–4.

25. Because the two December 26, 1990 Shearson proxies add up to the broker's total position, it is clear from the faces of the cards themselves that the firm intended to give 91,100 proxies to the Committee proxyholders and 17,450 proxies to the management proxyholders.

26. The stamp "REVOKES PRIOR PROXY" revoked Shearson's previous white card issuing 108,550 discretionary votes to management. That stamp did not revoke the December 26, 1990 green proxy card executed by Shearson.

E. *The Disputed Knoblauch Proxies*

27. On December 21, 1990, Knoblauch Private Bank ("Knoblauch") issued white proxy cards withholding authority from management to cast any proxy votes for five of the nominees of the current management, and granting authority to cast all 44,650 proxy votes for one nominee

of the current management, John C. Tuten, Jr.[4] P–27.

28. On December 21, 1990, Knoblauch issued green proxy cards, granting authority to the Committee proxyholders to cast 44,650 proxy votes for five nominees of the Committee, and withholding authority from the proxyholders to cast any proxy votes for one Committee nominee, Michael Ciriaco. P–27.

29. One of the white Knoblauch proxy cards gave management proxyholders the authority to vote all 44,650 proxy votes for proposals 2 and 3. D–2. One of the green Knoblauch proxy cards gave Committee proxyholders the authority to vote all 44,650 proxy votes for proposals 2 and 3. P–27.

30. The white card grants the management proxyholders authority to cast all 44,650 votes for "other matters" at the discretion of management. The green card gives Committee proxyholders the authority to cast all 44,650 votes at their discretion. The cards therefore conflict with each other. P–27.

F. *The Disenfranchisement of the Shearson and Knoblauch Proxies*

31. On December 27, 1990 Guaranty held its Annual Meeting. At the meeting, the votes were cast. D–7.

32. The Judge of Elections was R. Malcolm Ratson, a former Controller and Accountant for Guaranty who has maintained business relationships with several Board members of Guaranty. Tr. (1/25/91) at 72–74.

33. Guaranty hired Security Trust as an independent collector of proxies for the purpose of tabulating the vote. Tr. (1/25/91):14–16.

34. Security Trust's tabulation of the vote indicated a total vote count in excess of the number of available shares to be counted. Tr. (1/25/91) at 118:5–10.

35. Mr. Ratson then discounted Security Trust's tabulation and performed one

himself after a "challenge round" meeting on January 7, 1991. *Id.*

36. At the challenge round, Mr. Ratson solicited documentation from both parties to support their respective contentions about the validity of disputed proxies. Both Committee and Management offered objections to certain proxies.

37. Mr. Ratson received a copy of *Concord Financial Group, Inc. v. Tri–State Motor Transit Co.*, 567 A.2d 1 (Del.Ch. 1989) from Buchanan Ingersoll, counsel for Guaranty's Management.

38. Committee did not provide the judge of elections with legal research, but instead offered testimony to support its position. Tr. (1/25/91) at 107:22–108:6.

39. After consideration of all challenges, Mr. Ratson decided to disenfranchise the Shearson and Knoblauch proxies on the basis of facial inconsistency. D–7.

40. Because the Shearson December 26, 1990 white Management proxy had the facsimile-generated time indication on its face, Mr. Ratson considered it the latest in time. Based on his conclusion the white card was latest in time, Mr. Ratson found that the stamp "REVOKES PRIOR PROXY" revoked both the December 12, 1990 white proxy and the December 26, 1990 green proxy. For these reasons, he invalidated the December 12, 1990 white Management card and the December 26, 1990 green Committee card. Tr. (1/25/91) at 100:6–13.

41. Because the Shearson proxies were not inconsistent, *see* Finding of Fact 24, there was no need to inquire into which was later in time. Mr. Ratson abused his discretion in disenfranchising the votes from Shearson's December 26, 1990 green Committee proxy.

42. Because the December 21, 1990 Knoblauch proxies granted both Management and Committee authority to vote all 44,650 of Knoblauch's shares on proposi-

---

**4.** The Knoblauch proxies indicate a total of 44,650 voting shares. This total represents all shares controlled by Knoblauch under two separate holding names. Knoblauch Private Bank's position is actually 40,000 shares. The remain-

ing 4,650 shares are held under the name of Tobias Knoblauch Private Bank. P–27. Tr. (1/25/91) at 46–50. The 44,650 share were essentially voted together and therefore I will use that total for the purposes of these findings.

tions 2, 3, and 4, Mr. Ratson invalidated all Knoblauch proxies. Tr. (1/25/91) at 94:3–19.

43. Because the Knoblauch proxies conflict, the judge of elections did not err in invalidating those proxies.

### G. *The Result of the Election*

44. Mr. Ratson's "preliminary tally count," which was tabulated after the consideration of these objections and subsequent disenfranchisement of certain proxies, was

### QUESTION # 1: <u>ELECTION OF DIRECTORS</u>

|  | FOR | WITHHELD |
|---|---|---|
| William R. Dimeling | 608,615 | 60,680 |
| David W. Marston | 610,015 | 59,280 |
| Terry L. Moll | 610,105 | 59,190 |
| Jack D. Moran | 610,015 | 59,280 |
| Richard R. Schreiber | 608,915 | 60,380 |
| John C. Tuten, Jr. | 610,015 | 59,280 |
|  |  |  |
| Michael Ciriaco | 573,460 | 2,500 |
| Raymond L. Croft | 573,460 | 2,500 |
| Richard A. Ehst | 575,960 | 0 |
| Nicholas H. LaMotte | 573,460 | 2,500 |
| Elwood A. Reppert | 575,960 | 0 |
| Daniel J. Shaffer | 575,960 | 0 |
|  |  |  |
| Gerald R. Brennan | 775 | 0 |

D–7.

45. The addition of 91,100 Shearson proxies for Committee nominees pursuant to this court's factual finding that the Shearson December 26, 1990 proxy card was valid yields the following result:

QUESTION # 1: ELECTION OF DIRECTORS

|                     | FOR     | WITHHELD |
| ------------------- | ------- | -------- |
| William R. Dimeling | 608,615 | 60,680   |
| David W. Marston    | 610,015 | 59,280   |
| Terry L. Moll       | 610,105 | 59,190   |
| Jack D. Moran       | 610,015 | 59,280   |
| Richard R. Schreiber | 608,915 | 60,380  |
| John C. Tuten, Jr.  | 610,015 | 59,280   |
|                     |         |          |
| Michael Ciriaco     | 664,560 | 2,500    |
| Raymond L. Croft    | 664,560 | 2,500    |
| Richard A. Ehst     | 667,060 | 0        |
| Nicholas H. LaMotte | 664,560 | 2,500    |
| Elwood A. Reppert   | 667,060 | 0        |
| Daniel J. Shaffer   | 667,060 | 0        |
|                     |         |          |
| Gerald R. Brennan   | 775     | 0        |

D-7; P-28.

------

46. When the Shearson December 26, 1990 green proxy is counted, Committee wins the election, unless there is a statutory impediment to the committee victory.

47. The judge of elections found that because the Committee cards granted the Committee proxyholders discretionary authority, the Pennsylvania Control Shares Act applied to those proxies. The judge of elections then determined that the statute required disenfranchisement of all proxy votes for Committee. Tr. (1/25/91) at 110:11–13.

48. The judge of elections reached the following result after disenfranchising the Committee votes pursuant to the Control Shares Act.

QUESTION # 1: <u>ELECTION OF DIRECTORS</u>

|  | FOR | WITHHELD |
|---|---|---|
| William R. Dimeling | 608,615 | 60,680 |
| David W. Marston | 610,015 | 59,280 |
| Terry L. Moll | 610,105 | 59,190 |
| Jack D. Moran | 610,015 | 59,280 |
| Richard R. Schreiber | 608,915 | 60,380 |
| John C. Tuten, Jr. | 610,015 | 59,280 |
|  |  |  |
| Michael Ciriaco | 0 | 0 |
| Raymond L. Croft | 0 | 0 |
| Richard A. Ehst | 0 | 0 |
| Nicholas H. LaMotte | 0 | 0 |
| Elwood A. Reppert | 0 | 0 |
| Daniel J. Shaffer | 0 | 0 |
|  |  |  |
| Gerald R. Brennan | 775 | 0 |

D-7; P-28.

## II. DISCUSSION

In their complaint, the plaintiffs assert that the defendants violated federal and state law in conducting the December, 1990 proxy contest. They assert that Guaranty's management committed those violations to retain power in spite of the fact that the Committee nominees won the election. The defendants respond that the judge of elections fairly and correctly determined the outcome of the election. Additionally, the defendants have brought a counterclaim against Committee alleging securities law violations. The parties rely on both legal and factual arguments to support their positions.

### A. *The Shearson and Knoblauch Proxies*

The initial question presented to the court is one of fact: Whether Shearson and Knoblauch submitted irreconcilably conflicting proxies. I have concluded that the December 26, 1990 Shearson proxies are not identical and do not conflict. Therefore, the judge of elections abused his discretion when he treated the proxies as irreconcilably conflicting and relied on the facsimile time stamp to count only the proxy for management. Because the Knoblauch proxies conflict, however they cannot be counted without resort to extrinsic evidence. The Shearson votes alone secure a victory for Committee, and, therefore, I need not address the validity of the Knoblauch proxies. Thus, without looking beyond the four corners of the Shearson proxy, I conclude that Committee won the election unless the Pennsylvania Takeover Act of 1990, 15 Pa.Cons.Stat.Ann. § 2562 *et seq.* (Purdon Supp.1991) ("Act" or "Control Shares Act") rendered the proxies invalid.

### B. *The Control Shares Act and the Guaranty Proxy Contest*

#### 1. Standard of Review

■ The judge of elections disenfranchised the votes for Committee based on his legal determination that the Control Shares Act precluded him from counting those votes. Federal courts need not defer to election judges on legal issues. *Carey v. Pennsylvania Enterprises, Inc.*, 876 F.2d 333, 338 (3d Cir.1989). Therefore, this court will consider *de novo* the proper construction of the Act.

#### 2. The Statutory Scheme

The Control Shares Act regulates control share acquisitions of corporations. Under the law, a control share acquisition occurs when any person acquires voting power over specific percentages of control shares. "Control shares" are the "voting shares of a corporation that, upon acquisition of voting power over such shares by an acquiring person, would result in a control-share acquisition." 15 Pa.Cons.Stat.Ann. § 2562. It is important to note that the statute does not define a control-share acquisition as the acquisition of beneficial ownership but, rather, the acquisition of voting power.

■ The law provides a "safe harbor" for certain proxy contests:

For the purpose of this subchapter, a person shall not be deemed an acquiring person if such person holds voting power within any of the ranges specified in the definition of "control-share acquisition":

. . . .

(3) as a result of the solicitation of revocable proxies or consents with respect to voting shares if such proxies or consents both:

(i) are given without consideration in response to a proxy or consent solicitation made in accordance with the applicable rules and regulations under the Exchange Act; and

(ii) do not empower the holder thereof, whether or not this power is shared with any other person, to vote such shares except on the specific matters described in such proxy or consent and in accordance with the instructions of the giver of such proxy or consent. . . .

15 Pa.Cons.Stat.Ann. § 2563. Thus, proxy solicitations made in accordance with SEC rules that do not vest the holder with discretionary authority are exempt from the Act's sterilization provisions. I turn now to the application of the statute to this situation.

#### 3. The Committee Proxies and the Control Share Act

■ The Committee proxy card contained the following line: "In their discretion, the proxyholders are authorized to vote upon such other business as may properly come before the meeting." The vesting of discretionary authority in proxyholders is standard. Indeed, it is advisable since any shareholder may introduce a question to be voted upon at a shareholder's meeting. However, Pennsylvania can legitimately decide that it does not want proxyholders to have such authority under certain circumstances.

Committee argues that this language did not empower the holders to be proactive or bring new proposals before the meeting, but only authorized them to respond to unannounced proposals. It is true that the discretionary power vested in insurgent proxyholders extends only to proposals initiated by others. SEC Rule 14a–4(c) states, in relevant part:

A proxy may confer discretionary authority to vote with respect to any of the following matters:

(1) Matters which the persons making the solicitation do not know, a reasonable time before the solicitation, are to be presented at the meeting, if a specific statement to that effect is made in the proxy statement or form of proxy. . . .

17 C.F.R. § 240.14a–4(c)(1) (1990). The SEC has explained that the purpose of this rule "is only to allow the party filing the proxy statement to respond to proposals initiated by others." Securities Exchange Act of 1934, Release No. 34–23789 at 10 (November 10, 1986). Based on this fact, the plaintiffs argue that the discretionary

authority which they had did not really empower them to vote the shares.

Although I would like to agree with Committee, I cannot in good conscience read such a limitation into the law. In order to adopt Committee's interpretation of the statute, this court would have to hold that the verb "empower" as used in the Act actually means "empower to be proactive, rather than reactive." *See* P. Brief at 42. The statute does not imply any such limitation on the normal meaning of the word.

The proxy granted Committee's proxyholders discretionary authority. The statute says that a revocable proxy falls within the safe harbor if it satisfies two conditions, and the Committee proxy does not satisfy both those conditions. Therefore it falls outside of the safe harbor.

■ Committee then argues that the law does not apply to proxy contests because there is no permanent acquisition of voting power when a beneficial owner grants a revocable proxy in accordance with the rules and regulations promulgated by the SEC. The plaintiffs conclude that, because the law does not apply to proxy contests of this type at all, we need not inquire into the meaning of the safe harbor provision.

The safe harbor would be unnecessary, however, if this statute did not apply to revocable proxies issued in accordance with SEC rules. Committee makes a good argument, based on the legislative history of the Control Shares Act, that the legislature never intended to prohibit revocable proxies which grant discretionary authority unless the proxy contest is accompanied by a takeover attempt. That may have been the legislators' original purpose, but they wrote a statute that unequivocally applies to *all* proxy contests.

In considering Committee's argument, this court must construe the statute using Pennsylvania's rules of statutory construction. Under Pennsylvania law, "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.Cons.Stat.Ann. § 1921(b); *see also Coretsky v. Board of Comm'rs,* 520 Pa. 513, 555 A.2d 72 (1989) (when statute is clear and unambiguous, court may not embark upon task of ascertaining legislative purpose).

The Control Shares Act is quite clear; it applies to the acquisition of voting power, not only by ownership, but by revocable proxy unless the proxy falls under the safe harbor provision. Because Committee's proxyholders received discretionary authority from the proxy cards, the safe harbor does not apply. This court cannot ignore the language of the statute itself, the final embodiment of the legislative purpose. The legislature can amend the statute if, because of inartful drafting, the current law does not serve its purpose. It is not this court's province to amend the statute through interpretation.

For the foregoing reasons, I find that the Judge of Elections correctly concluded that the Control Shares Act required the sterilization of the proxies held by Committee.[5] The plaintiffs argue that, if the Act requires the disenfranchisement of their proxies, it is unconstitutional. It is the established practice of federal courts to resolve statutory questions at the outset, if the resolution of those questions might obviate the need to consider a constitutional question. *United States v. Wells Fargo Bank,* 485 U.S. 351, 354, 108 S.Ct. 1179, 1181–82, 99 L.Ed.2d 368 (1988) (citing *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring)); *see also Kranson v. Valley Crest Nursing Home,* 755 F.2d 46, 50 (3d Cir.1985) (federal court must be mindful of obligation to avoid constitutional issues where alternate ground for decision is available). Therefore, before considering the constitutionality of the Control Shares Act, I shall determine if there was a quorum present, as required by the state law and the corporation's by-laws, at the December meeting.

---

**5.** Because Pennsylvania law operated to sterilize the votes for Committee, I need not consider the defendants' counterclaim alleging that the prox-ies must be nullified because the plaintiffs committed violations of federal securities law.

### C. The Control Shares Act and the Quorum Requirement

■ Article III, Section 3 of Guaranty's Bylaws provides that "[t]he presence, in person or by proxy, of shareholders entitle[d] to cast at least a majority of the votes which all shareholders are entitled to cast on the particular matter shall constitute a quorum for purposes of considering such matter." P–47. The defendants argue that, because the Committee proxies could not be voted by operation of law, the shares represented by those proxies should not be counted in ascertaining the number required for a quorum. The defendants, by subtracting the "control shares" from the number of outstanding shares, conclude that the number of shares entitled to vote at the meeting was 1,090,440. Using this figure, 545,221 shares were required for a quorum. Because more than 545,221 shares were represented at the meeting, the defendants conclude that a quorum was present.

The defendants' argument fails because they misdefine the outstanding stock to be considered in computing the quorum. The disenfranchised shareholders never lost their entitlement to vote their stock. The Committee proxyholders, "acquiring persons" under the Control Shares Act, simply could not use the voting power vested in them by the revocable proxies because they had acquired enough votes to trigger the Act. If, upon hearing of their impending disenfranchisement, the shareholders who gave proxies for Committee appeared in person at the meeting, they could have voted. Thus, the number of outstanding shares entitled to vote must include the shares ineffectively cast by proxy for committee.

Furthermore, the ineffectiveness of a proxy does not exclude the shares represented by the proxy from the pool of outstanding shares. In *Capital Care Corp. v. Lifetime Corp.*, 1990 WL 158604, 1990 U.S.Dist.Lexis 13794 (E.D.Pa.1990), for example, there was some dispute about whether a large shareholder's proxy had been extended. The court noted that, if the

proxy were invalid, there would have been no quorum at the meeting. *Id.* at *8, 1990 U.S. Dist.Lexis 13794 at *24. *See also Noremac, Inc. v. Centre Hill Court, Inc.*, 164 Va. 151, 178 S.E. 877 (1935) (meeting invalid when void proxies counted for quorum).

Analogously, in *Italo Petroleum Corp. v. Producers' Oil Corp.*, 20 Del.Ch. 283, 174 A. 276 (1934), the court refused to count for purposes of a quorum 50,000 shares disqualified from voting. The court noted: "It is somewhat of an anomalous situation, not to say curious, if stockholders may help form a quorum for the transaction of business when they cannot participate in the decision of the business the quorum is convened to transact." *Id.* 174 A. at 281. Eliminating the shares whose owners issued ineffective proxies from the pool of outstanding voting stock has the same effect as counting those shares toward the quorum based on the complete pool. *Cf. Fradkin v. Ernst*, 571 F.Supp. 829, 841 (N.D.Ohio 1983) (stock not present at meeting cannot be excluded from pool of outstanding shares).

Guaranty has 1,666,400 outstanding voting shares.[6] 833,201 shares are required for a quorum; only 669,295 shares were present at the meeting. Because there was no quorum, the action taken at the December 27, 1990 meeting was not valid, and Guaranty must hold a meeting forthwith to elect a Board of Directors. In accordance with the foregoing opinion, I make the following

### III. CONCLUSIONS OF LAW

1. The court has subject matter jurisdiction of this controversy pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and pursuant to 28 U.S.C. §§ 1331 and 1337. This court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

2. Venue is proper in this district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and pursuant to 28 U.S.C. § 1391(b).

---

**6.** 2,010,000 outstanding less 343,600 treasury shares equals 1,666,400.

3. The plaintiffs have established that the December 27, 1990 meeting was conducted in the absence of a quorum and, therefore, the election of directors at that meeting is a nullity.

4. Judgment will be entered in favor of the plaintiffs and against the defendants.