IN THE MATTER OF GIANT PORTLAND CEMENT COMPANY, a corporation of the State of Delaware.

*New Castle, August 18, 1941.*

E. *Ennalls Berl,* of Southerland, Berl, Potter & Leahy, and *George Gray Thouron,* (*George C. Doub* of Marshall, Carey & Doub, of Baltimore, Md., of counsel) for petitioners.

*James R. Morford,* of Marvel & Morford, and *William H. Bennethum,* (*A. O. Dawson,* of Hines, Rearick, Dorr & Hammond, of New York City, of counsel), for defendants.

THE CHANCELLOR: This is a proceeding under *Section 31 of the General Corporation Law,* as amended, § 2063, *Revised Code* 1935, to determine the validity of the election of certain directors of Giant Portland Cement Company, at a stockholders' meeting held February 24th, 1941. The voting rights of the corporation were vested in its common stock, and both of the petitioners were owners of that class of

stock. Nine directors of the corporation were to be elected, and two tickets were nominated. For convenience, one of these tickets will be called the corporate "Management" ticket, and the other the "Opposition." Four of the persons nominated for directors were, however, on both tickets, and were, therefore, unquestionably elected. It is unnecessary to give their names. R. M. Craigmyle, E. G. Capen, Walter C. Beecken, Herbert C. Hauth and Alex Pinney, all of whom had been nominated on the "Opposition" ticket, were also declared elected by the inspectors conducting the election. Their pluralities were small, and the question is whether Walter L. Haehnlen, Sidney N. Peters, C. T. Williams, Jr., George Masters and Clayton D. Quaw, or any of them, all of whom were nominated by the corporate "Management" were in fact legally elected by a considerable plurality.

The defendant corporation had issued 282,543 shares of common stock, of which 214,823 shares, including those held by the petitioners, were represented at the meeting and were voted either in person or by proxy. Mr. Craigmyle led his associates in the vote cast for the ticket declared elected. His plurality was 611 votes; the plurality of the other four was only 91 votes. The petitioners not only claim that numerous votes cast on certain shares should not be counted for the "Opposition" ticket, declared elected, but also claim that certain other votes cast for the corporate "Management" ticket were improperly rejected by the inspectors, and should be counted. I am unable to agree with either of these contentions.

The first contention involves the consideration of *Sections* 17 *and* 29 *of the General Corporation Law,* §§ 2049, and 2061 Revised Code 1935.

*Section* 17 provides, in part:

(1) "Unless otherwise provided in the Certificate of Incorporation, each stockholder, shall at every meeting of the stockholders be entitled to one vote in person or by proxy for each share of the capital stock held by such stockholder, * * *.

(2) "* * * and, except where the transfer books of the corporation shall have been closed or a date shall have been fixed as a record date for the determination of its stockholders entitled to vote, as hereinafter provided, no share of stock shall be voted on at any election for directors which shall have been transferred on the books of the corporation within twenty days next preceding such election of directors.

(3) "The board of directors shall have power to close the stock transfer books of the corporation for a period not exceeding fifty days preceding the date of any meeting of stockholders * * *; provided, however, that in lieu of closing the stock transfer books, as aforesaid, the by-laws may fix or authorize the Board of Directors to fix in advance a date, not exceeding fifty days preceding the date of any meeting of stockholders * * * as a record date for the determination of the stockholders entitled to notice of, and to vote at, any such meeting * * *.

(4) "* * * and in such case such stockholders and only such stockholders as shall be stockholders of record on the date so fixed shall be entitled to such notice of, and to vote at, such meeting and any adjournment thereof * * *."

### Section 29 provides:

"The original or duplicate stock ledger shall be the only evidence as to whom [sic] are the stockholders entitled to examine such list or the books of the corporation, or to vote in person or by proxy at such election."

### Pursuant to the provisions of Section 17, the by-laws of Giant Portland Cement Company provide:

1. "At each meeting of the stockholders every stockholder shall be entitled to vote in person, or by proxy * * * and he shall have one vote for each share of stock registered in his name at the time of the closing of the transfer books for said meeting. No share of stock shall be voted on at any election which has been transferred on the books of the corporation within twenty days next preceding such election. * * *"

2. "The Board of Directors may close the transfer books in their discretion for a period not exceeding thirty days preceding any meeting, annual or special, of the stockholders, or the day appointed for the payment of a dividend."

### The by-laws of that corporation also provide:

"Transfers of stock shall be made on the books of the corporation only by the person named in the certificate, or by attorney, lawfully constituted in writing, and upon surrender of such certificate."

By a resolution of the board of directors, the stock transfer books of the corporation were closed from February 4th to February 24th, 1941, or for twenty days prior to the stockholders' meeting on the latter date. During that period no stock was transferred on the corporate records. Certain shares were, however, sold by record owners, and the stock certificates were duly assigned and delivered to the purchasers prior to the stockholders' meeting. Some of these shares were voted for each ticket on proxies given by the record owners. Of the shares claimed to have been improperly counted, 5472 were cast and counted for the "Opposition" ticket, on which Craigmyle and his associates were the nominees, and all of whom were declared elected. Thirteen hundred and eighty-four (1384) shares in the same category were, however, voted and counted for the "Management" ticket, on which Walter L. Haehnlen and his associates were the nominees. This makes a difference of 4088 votes, in favor of the winning ticket, which the petitioners claim were improperly counted; while as already indicated the plurality of Craigmyle, the high man on that ticket, was only 611 votes.

If the votes in controversy should be rejected by this court, it might affect the result of the election, as shown by the report of the inspectors. In cases coming within the provisions of *paragraph 2 of Section 17 of the General Corporation Law*, stock transferred on the books of the corporation within twenty days prior to a stockholders' meeting, for the election of directors, is temporarily disfranchised, and cannot be voted either by the transferor or by the transferee. *Moon v. Moon Motor Car Co.*, 17. *Del. Ch.* 176, 151 *A.* 298; *Italo Petroleum Corp. v. Producers Oil Corp.*, 20 *Del. Ch.* 283, 174 *A.* 276. But all stock sold within that period is not necessarily temporarily disfranchised, and this case is not governed by that provision of the statute. *Thompson v. Blaisdell*, 93 *N.J.L.* 31, 107 *A.* 405. It comes within the exceptions referred to in *paragraph 2* which are

more specifically covered by *paragraphs* 3 *and* 4 *of Section* 17. On February 24th, 1941 the stock in question had not been transferred on the books of the corporation to the purchasers of the certificates. When the corporate transfer books are closed by appropriate action taken by the board pursuant to authority given by the by-laws, *Section* 17 provides that "such stockholders and only such stockholders as shall be stockholders of record on the date so fixed shall be entitled to * * * notice * * * and to vote" for the election of directors at the subsequent stockholders' meeting. The persons on whose proxies the stock was voted at the stockholders' meeting were stockholders of record within this provision of the statute, though they were not the real beneficial or equitable owners of that stock.

The right to vote shares of corporate stock having voting powers, has always been incident to its legal ownership. 5 *Fletcher Cyc. Corp., (Per. Ed.)* §§ 2027, 2032, 2033; *In re North Shore Staten Island Ferry Co.*, 63 *Barb., (N.Y.)* 556; *People v. Devin*, 17 *Ill.* 84; *Dennistoun v. Davis*, 179 *Minn.* 373, 229 *N.W.* 353. Nor is the first part of *Section* 17 anything more than declaratory of that common law rule. Moreover, whatever the rights of the mere unrecorded assignee of the stock certificate might be in the absence of a by-law or other contract provision requiring all transfers of shares to be recorded on the books of the corporation (5 *Fletcher* § 2033, *supra;* 12 *Fletcher* §§ 5489, 5501, *supra; People v. Devin, supra*), it is not contended that such a provision is not authorized or is not binding as between stockholders and the corporation. See *Allen v. Stewart*, 7 *Del. Ch.* 287, 44 *A.* 786; *Johnston v. Laflin*, 103 *U.S.* 800, 26 *L. Ed.* 532; 12 *Fletcher* §§ 5488, 5489, *supra; Morawetz Priv. Corp.* §§ 321, 325, 366.

Under the rule in this State, and in numerous other jurisdictions, notwithstanding such a by-law, as between the transferor and the unrecorded transferee of the stock certificates, the legal title apparently passes to the latter.

See *State ex rel. Cooke v. New York-Mex. Oil Co.*, 2 *W. W. Harr.* (32 *Del.*) 244, 122 *A.* 55; *Bankers Mtg. Co. v. Sohland,* 3 *W. W. Harr.* (33 *Del.*) 331, 138 *A.* 361; *Chadwick v. Parkhill Corp. Ltd.*, 16 *Del. Ch.* 105, 141 *A.* 823; *Drug, Inc. v. Hunt*, 5 *W. W. Harr.* (35 *Del.*) 339, 168 *A.* 87; *In re Canal Construct. Co.*, 21 *Del. Ch.* 155, 182 *A.* 545; 12 *Fletcher* §§ 5488, 5496, *supra;* 14 *C. J.* 752; 18 *C.J.S., Corporations,* § 434. Practical reasons may perhaps justify that rule. But a very different rule applies between the corporation and the mere unrecorded assignee of the certificate of stock. That is because limited contract restrictions relating to stock transfers are for the benefit of the corporation, and to enable it to ascertain from its records who its members or stockholders are. *Allen v. Stewart, supra; Johnston v. Laflin, supra;* 12 *Fletcher,* §§ 5489, 5501, *supra.* So far as the corporation is concerned, until such a by-law is complied with, the record owner must, therefore, be regarded as the real owner of the stock, with the consequent general right to vote it by proxy, or otherwise. 5 *Fletcher,* § 2033, *supra;* 12 *Fletcher,* §§ 5497, 5501, *supra; In re Argus Printing Co.,* 1 *N.D.* 434, 435, 48 *N.W.* 347, 12 *L.R.A.* 781, 26 *Am. St. Rep.* 639; *State v. Ferris*, 42 *Conn.* 560; *Morrill v. Little Falls Mfg. Co.*, 53 *Minn.* 371, 55 *N.W.* 547, 21 *L.R.A.* 174; *Atterbury v. Consolidated Coppermines Corp., ante p.* 1, 20 *A.* 2d 743. When considered from a legal standpoint, there is no privity of contract between the mere holder of the certificate and the corporation, and he is not a real member of that organization until the transfer is recorded. 12 *Fletcher,* § 5500, *supra; Whitfield v. Nonpariel Consol. Copper Co.*, 67 *Wash.* 286, 123 *P.* 1078, 41 *L.R.A.*, (*N.S.*) 187. Until that time, the possible legal rights of the holder of the certificate are of an inchoate nature. *Cheatham v. Wheeling & L. E. R. Co.*, (*D.C.*) 37 *F.* 2d 593. In other words, a real novation, whereby a new contract between the mere holder of the certificate and the corporation is substituted for the prior contract of the record owner, can only be brought about

by complying with the corporate regulation relating to transfers of stock. *Morawetz Priv. Corp.*, §§ 323, 326; 12 *Fletcher*, § 5497, *supra; Talbot v. Talbot*, 32 *R.I.* 72, 78 *A.* 535, *Ann. Cas.* 1912 *C*, 1221. The record owner may, therefore, be the mere nominal owner, or, technically a trustee for the holder of the certificate (*In re Canal Const. Co.*, 21 *Del. Ch.* 155, 182 *A.* 545; *Thompson v. Blaisdell*, 93 *N.J.L.* 31, 107 *A.* 405; 12 *Fletcher*, § 5498, *supra*), but legally he is still a stockholder in the corporation, and so far as the corporation is concerned, like the usual trustee (2 *Machen Modern Law Corp.*, § 1223; *In re Barker*, 6 *Wend.* (*N.Y.*) 509; *Morawetz Priv. Corp.*, § 373), ordinarily has the right to vote the stock standing in his name. *In re Canal Construct. Co.*, *supra; Thompson v. Blaisdell*, *supra; Atterbury v. Consolidated Coppermines Corp.*, *supra;* 2 *Machen Modern Law Corp.*, §§ 1220, 1226. In cases of this nature, when nothing more than a mere dry trust is involved the owners of the certificates can usually protect their rights by recording the transfers and having new certificates issued; but, even though that could not be done in this case because the corporate transfer books were closed at the time of the assignments, they could have compelled the record owners to give them proxies to vote the stock standing in their names. *In re Canal Construct. Co.*, *supra; Thompson v. Blaisdell*, *supra; In re Argus Printing Co.*, *supra; Commissioner of Internal Rev. v. Southern Bell Tel. & Tel. Co.*, (6 *Cir.*) 102 *F.* 2d 397; 2 *Machen Modern Law Corp.*, § 1223. A mere nominal owner naturally owes some duties to the real beneficial or equitable owner of the stock; and even if the right to demand a proxy is not exercised, if the vendor exercises his legal right to vote in such a manner as to materially and injuriously affect the rights of the vendee, he is perhaps answerable in damages in some cases. *Witham v. Cohen*, 100 *Ga.* 670, 28 *S.E.* 505; *In re Canal Construct. Co.*, *supra;* 2 *Machen Modern Law Corp.*, §§ 1223, 1226. The real scope of that rule, as between the parties, need not be considered; but even in

this proceeding, it can hardly be contended that the actual consent of the holder of the certificate is ordinarily essential to the right of the record owners to vote stock standing in their names. *Atterbury v. Consolidated Coppermines Corp., supra.* See also *Morawetz Priv. Corp.,* § 373. At any rate, in cases of this nature, in the absence of an objection, consent would ordinarily be presumed. *Atterbury v. Consolidated Coppermines Corp., supra.* See also *In re Pressed Steel Car Co. of New Jersey,* (D.C.) 16 *F. Supp.* 329; *Hoppin v. Buffum,* 9 *R.I.* 513, 11 *Am. Rep.* 291.

*Section* 29 *of the General Corporation Law* is also in general accord with these established principles. It provides a limited but practical statutory rule of evidence whereby the persons entitled to notice of and to vote at a stockholders' meeting can be readily ascertained by an inspection of the corporate records; but it is in no sense the real origin of the stockholder's right to vote. 5 *Fletcher,* § 2033, *supra.*

Ordinarily the inspectors conducting an election for the selection of directors for the corporation are bound by that section, and cannot question the right of a registered owner to vote stock standing in his name on the books of the corporation. *In re Canal Construct. Co., supra; In re Election of Directors of St. Lawrence Steamboat Co.,* 44 *N.J.L.* 529. But when *Section* 29 is read in connection with *Section* 31, it is apparent that it is not necessarily controlling on this court, if inequitable circumstances appear making it improper for the record owner, having the bare legal title, to vote the stock standing in his name. *In re Canal Construction Co., supra.*

*Section* 31 provides:

"Upon the application by any stockholders, the Chancellor shall have power to hear and determine the validity of any election of any director * * * of any corporation organized under this Chapter and the right of any person to hold such office * * *."

The same section further provides:

"The Chancellor in any proceeding instituted under this Section shall have power to determine the right and power of persons claiming to own stock, to vote at any meeting of the stockholders authorized by or referred to in this Section."

Perhaps in most cases, so far as the corporation is concerned, when the "right and power" of a mere record owner to vote is questioned under this provision of the statute, some *ultra vires*, negligent or improper wilful act or omission on the part of the corporation, or its agents, is relied on, and must appear. *In re Associated Automatic Sprinkler Co.*, 11 *Del. Ch.* 369, 102 *A.* 787; *Italo Petroleum Corp. v. Producers Oil Corp.*, 20 *Del. Ch.* 283, 174 *A.* 276; *In re Diamond State Brewery*, 22 *Del. Ch.* 364, 2 *A.* 2d 254; 2 *Machen* §§ 1221, 1222, *supra*. But under the same provision of the statute, it seems that in some cases this court may also reject votes cast by the record owners, which are regarded as improper solely because of some peculiar, inequitable circumstances affecting the relation between such apparent owners and the transferees of the certificates. That rule was applied in *Re Canal Construction Company, supra*. There the votes subsequently rejected by the court were cast by a personal representative of a deceased person, who had transferred the stock certificates to the parties entitled, had passed his final account, and had been discharged as administrator. For his own personal ends, and without any real justification, he took some subsequent steps to open the estate, and voted the stock standing in his name as administrator on the corporate records, contrary to the wishes of the real beneficial owners.

Conceding that, "as between a transferor who has parted with all beneficial interest in stock and his transferee, the broad equities are all in favor of the latter in the matter of its voting"; and also conceding that "a court of equity ought not either by direction or indirection lend its aid to the accomplishment of" an inequitable purpose, *In re Canal*

*Construction Company, supra* [21 *Del. Ch.* 155, 182 *A.* 548], involves different facts, and does not control this case. Whatever effect that might have had in this proceeding, so far as appears directions were neither given to the record owners by the holders of the certificates, nor did they object to the votes cast. Moreover, there is some evidence that the proxies given, and the votes cast thereon, were in accordance with the wishes of the real beneficial owners of the stock. Of the 7256 shares in controversy voted for the "Opposition" ticket, 2284 shares stood on the corporate records in the name of John J. Connoly; 3972 shares in the name of H. Randolph Guggenheimer, and 1000 shares in the name of Anna Gordon Hunter. Proxies to vote these shares for the "Management" ticket were given by the respective record owners on February 7th, 1941, January 30th, 1941 and February 7th, 1941. Other proxies, in favor of the "Opposition" ticket, were, however, given by the same persons on February 18th, February 21st and February 20th, 1941 respectively. The record also shows that the latter proxies were given about the time of the sale and transfer of the stock certificates. The petitioners point out that a proxy had first been given by Anna Gordon Hunter, in favor of the "Opposition" ticket, before February 7th, 1941, but I do not regard that as of any real importance in determining this phase of the case. As I have already indicated, the stock in question was properly voted for the winning ticket. Other questions are raised by the petitioners, in support of their claim that the "Management" ticket should be declared elected, but the only contention that need be considered relates to the proxy to vote the 300 shares of O'Byrne stock. The certificate for that stock was issued in the names of Frank M. O'Byrne and Irene O'Byrne, who were and are husband and wife, though they were not described as such in that instrument. The proxy produced at the stockholders' meeting was merely signed "F. M. O'Byrne"; the voting agents named therein offered to vote the stock for the "Man-

agement" ticket, but the inspectors conducting the election rejected the proxy because it was not signed by Irene O'Byrne, as well as by her husband. The petitioners claim that such action was improper. They claim that O'Byrne and his wife held that stock as tenants by the entirety, and in the absence of definite objections made, or of separate proxies given by each, either tenant had the right to vote the stock standing in their names, whether in person or by proxy. It is necessarily conceded that tenancies by the entirety in land are valid in this State (*Carlisle v. Parker*, 8 *W. W. Harr.* (38 Del.) 83, 84, 188 *A.* 67; *Heitz v. Sayers*, 2 *W. W. Harr.* (32 *Del.*) 207, 121 *A.* 225; *Hurd v. Hughes*, 12 *Del. Ch.* 188, 109 *A.* 418; *Kunz v. Kurtz*, 8 *Del. Ch.* 404, 68 *A.* 450), and that the same general rules, applicable to such tenancies also apply to personal property. *Ciconte v. Barba*, 19 *Del. Ch.* 6, 161 *A.* 925; *Rauhut v. Reinhart*, 22 *Del. Ch.* 431, 180 *A.* 913; *Brewer v. Bowersox*, 92 *Md.* 567, 568, 48 *A.* 1060. It is also at least tacitly admitted that, for all practical purposes Frank M. O'Byrne and Irene O'Byrne must be regarded as tenants by the entirety of the stock standing in their joint names, though they were not described in the certificate as husband and wife. *Ciconte v. Barba, supra; Brewer v. Bowersox, supra; In re Bramberry's Est.*, 156 *Pa.* 628, 27 *A.* 405, 22 *L.R.A.* 594, 36 *Am. St. Rep.* 64; 1 *Bouv. Law Dict., Rawles 3rd Rev.*, 1043; 26 *Amer. Jur.* 695. Estates of that nature in land are based on the legal fiction, recognized at common law, that husband and wife are one. Both tenants are seized *per tout* but not *per my*, and are, therefore, the owners of the whole estate during their joint lives. *Carlisle v. Parker, supra; Heitz v. Sayers, supra.* In other words, as between husband and wife there is but one owner; and that is neither the one nor the other, but both together. *Heitz v. Sayers, supra; Carlisle v. Parker, supra; Davis v. Clark*, 26 *Ind.* 424, 89 *Am. Dec.* 471; 1 *Bouv. Law Dict., Rawle's 3rd Rev.*, 1043 *supra.* From the peculiar nature of the estate, and from the legal relation

of the parties, it, therefore, necessarily follows that there must be unity of estate, unity of possession, unity of control and unity in conveying or encumbering entirety property. *Carlisle v. Parker, supra;* 1 *Bouv. Law Dict., Rawle's 3rd Rev.,* 1043, *supra.* On the death of one tenant, the survivor continues to own the same estate or interest in the property held by both of them, and acquires no real new interest by the death of the other. *Carlisle v. Parker, supra.* At common law, and before the enactment of the Married Women's Act, *Rev. Code* 1935, § 3540 *et seq.,* the husband had the right to use, manage and enjoy his wife's real property during his lifetime. *Carlisle v. Parker, supra.* That general rule applied to entirety property, but was not in any sense a mere incident of such an estate. *Carlisle v. Parker, supra.* While the Married Women's Act does not affect the creation of an estate by the entirety in the wife, it does materially affect her husband's right to manage and enjoy her property during his lifetime. *Heitz v. Sayers, supra.* Moreover, it has been held that her interest in an estate by the entirety is her sole and separate property, within the meaning of that Act. *Hurd v. Hughes, supra; Heitz v. Sayers, supra; Carlisle v. Parker, supra.* Applying these principles to this case, the stock in question could not be voted on a proxy signed merely by F. M. O'Byrne. Both husband and wife, but neither of them alone, were stockholders in and members of the defendant corporation. Both were entitled to exercise and enjoy jointly, but not otherwise, all of the usual rights and powers incident to stock ownership, including the right to vote such stock in person or by proxy. It is true that, in the absence of any objection by his co-owner, one of two executors or administrators may vote stock standing in their joint names (*Sellers v. Joseph Bancroft & Sons Co.,* 25 *Del. Ch.* 268, 17 *A.* 2d 831), but this case involves a very different joint ownership.

The Pennsylvania cases cited by the petitioners (*O'Malley v. O'Malley,* 272 *Pa.* 528, 116 *A.* 500 and *Gasner v.*

*Pierce,* 286 *Pa.* 529, 134 *A.* 494) apparently concede the correctness of substantially all of the general principles hereinabove stated, but apply them in a somewhat different manner. Because of the unity of the estate, they hold that either tenant may lease entirety property, and that in any event either may legally collect the rents therefrom. This is not because any such right is a real incident of the estate, but because it flows from an incident thereof. *Id.* These cases also indulge in the presumption that any lease made or any rent collected by one, is for the real benefit of both. But it seems difficult to reconcile them with the principles announced in our own cases. See *Carlisle v. Parker.* Nor did *Heitz v. Sayers, supra,* involve the separate contract of one of two tenants by the entirety.

All of the persons nominated on the "Opposition" ticket were, therefore, legally elected directors of the defendant corporation. No other contentions made could possibly change this result.

An order will be entered accordingly.