# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LISA ANDERSON,[1] | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2018-0449-SEM |
| | ) | |
| RANDALL LEE HILL, JOSHUA ABBOTT, | ) | |
| CHRISTOPHER SHORT, | ) | |
| TAYLOR L. GRANTHAM, and THE | ) | |
| ESTATE OF CHARLES D. ANDERSON, | ) | |
| BY AND THROUGH SHEILA L. WILKINS, | ) | |
| EXECUTRIX, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| AND | ) | |
| | ) | |
| JACKSON NATIONAL LIFE INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| A Nominal Party. | ) | |

## FINAL POST-TRIAL REPORT

Final Report: January 5, 2024
Date Submitted: August 17, 2023

Dean A. Campbell, DEAN A. CAMPBELL, P.A., Milton, Delaware; *Counsel for Plaintiff Lisa Anderson.*

Gerry Gray, DOROSHOW PASQUALE KRAWITZ & BHAYA, Smyrna, Delaware; *Counsel for Defendant Randall Lee Hill.*

**MOLINA, M.**

---

[1] Anderson Enterprises Inc. was added as a co-plaintiff at the pre-trial conference. *See* Docket Item ("D.I.") 88. Anderson Enterprises Inc. is not, however, a party to the sole remaining dispute; thus, I decline to amend the caption.

Tumultuous as it may be, this estate-related action presents one question—who is the rightful owner of a 1937 Ford Coupe? In this post trial ruling, I find the plaintiff is the rightful owner. The plaintiff and her late husband owned the vehicle jointly by the entireties. The husband, thus, did not have authority to transfer ownership without the plaintiff's consent. Yet he attempted to do so, and title was transferred to the husband's cousin. Equity compels that such transaction be rescinded, and title to the vehicle returned to the plaintiff, its rightful owner. But, for the reasons explained herein, I recommend each side bear its own fees (except those fees already shifted during discovery). Costs should be shifted to the plaintiff as the prevailing party.

This is my final report.

## I. BACKGROUND[2]

On December 29, 1987, Lisa Rauscher (later, Lisa Anderson then Lisa Craig,

---

[2] The facts in this report reflect my findings based on the record developed at trial on March 15, 2023. *See* D.I. 94. I grant the evidence the weight and credibility I find it deserves. Citations to the trial transcript are in the form "Tr. #." Joint exhibits 1–19 are cited as "JX#." For clarity, the depositions admitted into evidence as JX16–18 are cited as "Last Name Dep." (Hill Dep., McGroerty Dep., and Anderson Dep., respectively).

The Defendant disputes the admissibility of testimony from Sheila Wilkins, the Decedent's daughter, regarding her discussions with her father. *See* Tr. 20:22–22:20. I overruled the Defendant's hearsay objection at trial and permitted the testimony under Delaware Rule of Evidence 804(3); my ruling stands. The Defendant also objected to JX7; I do not rely on JX7 in this report and, thus, the objection is moot.

the "Plaintiff")[3] and Charles Anderson (the "Decedent") married.[4] For much of their relationship, the Plaintiff and the Decedent worked in tandem. But marital tensions flared beginning in 2016 and continuing until the Decedent's untimely death on May 6, 2018.[5] After the Decedent's death, the steps the Plaintiff and the Decedent took reacting to those tensions came to light, complicating the administration of the Decedent's estate. This report addresses those tensions, the steps taken in response, and the lingering issue that remains.

## A. The Early Years

The Plaintiff and the Decedent "were both self-employed in their respective businesses operated under the corporate name, Anderson Enterprises, Inc." ("AEI").[6] The Plaintiff worked as a beautician, the Decedent as an antique dealer.[7]

---

[3] *See* Tr. 35:10–15, 96:20–97:5. At the pretrial conference, I granted the Plaintiff's request to add what is herein defined as AEI as a second plaintiff. *See* D.I. 88. That addition was, however, primarily to address the life insurance dispute that has since been resolved. *See* D.I. 92. Thus, I refer to the Plaintiff as the sole plaintiff prosecuting the remaining portion of this action.

[4] Tr. 36:5–6; D.I. 88 § III, ¶ 1; Anderson Dep. 6:9.

[5] *See* D.I. 88 § III, ¶ 5.

[6] D.I. 88 § III, ¶ 3. The Plaintiff was, however, the majority owner of AEI (owning 97% to the Decedent's 3%). *Id.* ¶ 4.

[7] Tr. 37:23–38:4. The Plaintiff worked out of her parents' home, in which she and the Decedent resided beginning in 1999. Tr. 37:8–22. Although the Decedent held himself out as owning an antique shop (*see, e.g.*, McGroerty Dep. 13:15–14:24), the Plaintiff insists that his "business" was more of a hobby and the antique shop at their property was not in operation during their marriage. Tr. 40:15–42:14, 44:18–46:9, 107:2–9.

The Decedent's business did not generate steady income, although the Decedent would sell certain items when necessary to make ends meet.[8] The Decedent's primary financial contribution to the marital assets was his monthly social security.[9] That income, along with all of the pair's income, went into one of three jointly owned bank accounts.[10] The Decedent did not have any separate bank accounts and the Plaintiff, generally, handled the couple's finances.[11]

Diverse as some of their interests may be, the couple shared a fondness for antique cars.[12] They collected cars since the beginning of their relationship.[13] All their cars were typically stored in their pole barn garage or at a friend's garage.[14] Together, they owned several cars, including the 1937 Ford Coupe (the "Coupe").[15]

The Plaintiff and the Decedent purchased the Coupe on or around May 1, 2007, as reflected in the title issued that date (the "Original Title").[16] They purchased

---

[8] Tr. 41:6–10.

[9] Tr. 42:12–14.

[10] Tr. 42:15–43:6.

[11] Tr. 58:3–7.

[12] The Decedent enjoyed buying and selling vintage items; he owned a diverse collection of taxidermy, clocks, exotic birds, and antique toys and automobiles. Tr. 40:15–41:5, 65:16–66:3.

[13] Tr. 40:19–22.

[14] Tr. 56:23–57:6.

[15] Tr. 47:2–13.

[16] Tr. 52:9–19, 55:5–11, 57:17–23. The Plaintiff testified that she believes they owned the Coupe before May 2017, but she did not introduce an earlier title. *See* JX3.

it from Dave Hudson—a garage owner in Harbeson—for $15,000.[17] The Plaintiff believes the purchase money came from the couple selling several other cars, which were jointly owned.[18] After their purchase, the Coupe was registered as: "ANDERSON CHARLES D &OR ANDERSON LISA B."[19] The Coupe was "restricted for use only in club activities, exhibits, tours, and parades[,]" and not to be "used for general transportation."[20] The Plaintiff and the Decedent used it as such; occasionally driving it to and from car shows and fairgrounds, but never using it for day-to-day transportation.[21]

Blue Ribbon Classic Auto Appraisal Services, LLC (the "Appraiser") appraised the Coupe on October 15, 2009.[22] The Appraiser found the Coupe was in good condition and valued it at $22,000.00.[23]

---

[17] Tr. 52:9–19, 55:5–11, 57:17–23.

[18] Tr. 55:12–18.

[19] JX3–4. That designation was on all their vehicles except one, which was in the Decedent's sole name. Tr. 53:8–14.

[20] JX4.

[21] Tr. 53:15–54:15. But the Plaintiff testified that she would drive the Coupe around the block to keep it in working condition. Tr. 234:17–235:6.

[22] Tr. 234:17–235:6.

[23] JX2.

## B. The Turbulence[24]

In late 2016, the Decedent's physical health declined. He suffered a stroke and was diagnosed with diabetes and heart disease, among other ailments.[25] The decline was contemporaneous with (and perhaps exacerbated by) two life changes. The first was his father's death around October 2016.[26] The Decedent's loss was amplified when he learned he was specifically written out of his father's will.[27] The second life change was propelled by the Plaintiff—she wanted to downsize and retire, an interest the Decedent did not share.[28]

In ill health and facing unwanted life changes, the Decedent's final years were turbulent.[29] The Plaintiff testified candidly about the end of her relationship with the Decedent. It is apparent that their once stable partnership dissolved before the Decedent's death. But, with the Decedent's passing, I am left with only one side of the story. Herein, I make no judgments on the reason for (or blame necessary to

---

[24] The Defendant disputes that the marriage became turbulent in or around 2016. Tr. 192:13–18. But I found the Plaintiff's testimony credible and supported by the Decedent's petition for divorce wherein he noted the couple had been separated "since 2016." Tr. 67:2–69:7; JX9.

[25] Tr. 67:2–14.

[26] Tr. 68:14–15.

[27] Tr. 67:21–68:5.

[28] Tr. 66:16–67:1.

[29] Tr. 68:16–20.

understand) the relationship's end, nor do I attempt to summarize every step in that direction. Rather, I focus on those steps that I find relevant to the issue at hand.

## C. The Sale of the Coupe

During the final tumultuous years, the Plaintiff recalls driving the Coupe to the Apple Scrapple Festival in October 2017 (20 miles away from their home).[30] Little did she know, though, that the Decedent was already in talks to sell the Coupe to his cousin, Randall Lee Hill (the "Defendant").

The Defendant is the Decedent's younger cousin.[31] He lived about 14 miles away from the Decedent and, when the Decedent's health declined, would drive the Decedent to and from Lancaster, Pennsylvania to visit the Amish markets.[32] During one of their road trips, the Defendant and the Decedent started to discuss the Defendant buying the Coupe.[33]

Like his cousin, the Defendant is an avid car collector.[34] From visiting with the Decedent and frequenting many of the same car shows, the Defendant was familiar with, and always interested in, the Coupe.[35] During their drives, sometime

---

[30] Tr. 234:1–16.

[31] Tr. 164:19–21, 165:8–10.

[32] Tr. 164:22–165:1, 172:10–173:19.

[33] Tr. 179:17–180:5.

[34] *See* Tr. 169:19–20.

[35] The Defendant testified that he never saw the Plaintiff drive the Coupe. Tr. 177:19–178:6, 178:19–20. The Defendant also maintains that he asked the Decedent about buying

in 2017, the Defendant testified that he and the Decedent reached an agreement: the Defendant would buy the Coupe for $12,000.00.[36] The Defendant admitted that the Plaintiff was unaware of the purported agreement; per the Defendant and the Decedent's attorney, the Decedent wanted to sell the Coupe and use the proceeds to surprise the Plaintiff with a convertible.[37]

Assuming there was such an agreement, whether the Defendant did (or even could) meet his end of the bargain is hotly contested. The Defendant testified that he gave the Decedent $9,000.00, as his initial payment on the Coupe, in November 2017.[38] But there is no record of such transaction, neither in the Defendant's files nor the Decedent's.[39] And the Defendant testified candidly that he was struggling

---

the Coupe on several occasions, even in front of the Plaintiff during a family cookout. Tr. 179:17–19, 177:3–11. The Defendant asserts that the Plaintiff did not object to the offer at that time. Tr. 177:12–18. The Plaintiff denies this occurred. Tr. 235:7–14.

[36] Per the Defendant, the Decedent agreed to "sell it to [the Defendant] for the same amount that he paid for it." Tr. 180:8–9. Per the Defendant, that price was $12,000.00; the Plaintiff testified, however, that they purchased the Coupe for $15,000.00. Hill Dep. 16:3–5; Tr. 55:5–11, 176:19–22, 190:6–18.

[37] Hill Dep. 22:23–23:1; McGroerty Dep. 29:11–15. The Plaintiff testified that, as a hairdresser, she has no interest in a convertible. Tr. 235:18–236:6.

[38] Tr. 184:23–185:4.

[39] The only purported record is a handwritten note within JX12, to which the Plaintiff objected. Because I do not rely on JX12 in this report, the objection is moot.

financially at that time.[40]  Nevertheless, the Defendant testified that he gave the Decedent cash from his safe.[41]

On January 15, 2018, the Defendant testified that he went to the Decedent's house and paid the remaining $3,000.[42] Per the Defendant, the Decedent immediately retrieved the Original Title and signed it over to the Defendant.[43]  The Original Title reflects as much: on the second page, the Original Title reflects a sale to the Defendant, from the Decedent, on January 15, 2018 for $12,000.00.[44] The Defendant testified that he took the Original Title and stored it in his safe for safekeeping.[45]

But the Defendant did not immediately take possession of the Coupe or work to transfer title.  As the Original Title reflects, the "Purchaser's Application" section was not submitted until March 6, 2018.[46]  The Defendant testified that he did not

---

[40] The Defendant discovered that a family member wrote fraudulent checks from his account, putting him in a financial hole. Tr. 201:22–204:13, 206:13–207:3. The Defendant was also behind on his mortgage. *See* JX13.

[41] Tr. 185:5–6, 189:19–190:8.

[42] Tr. 190:9–18, 191:5–192:3. The order of these payments is reversed from the order described in the Defendant's answer wherein he averred: "The transaction was initiated in November 2017 with a down payment of $3,000.00 and completed January 15, 2018 when [the Defendant] made his final payment of $9,000.00[.]" D.I. 23 ¶23.

[43] Tr. 191:14–18.

[44] JX3.

[45] Tr. 195:20–196:3; Hill Dep. 14:22–23, 18:5–9.

[46] JX3.

sign his portion and work to transfer title until March 2018 because he believed he needed to take the Coupe to be registered in person.[47] But, in January, per the Defendant, he did not have room for the Coupe.[48] And the Decedent purportedly agreed that the Defendant could leave the Coupe with the Decedent and pick it up when he was ready—the keys would be waiting for him.[49]

### D. The Family Court Proceedings

By March 2018, the marital tensions between the Plaintiff and the Decedent were coming to a head. On March 5, 2018, the Plaintiff felt so threatened that she filed for a protection from abuse order against the Decedent.[50] The Delaware Family Court, finding an immediate and present danger to the Plaintiff, issued an *ex parte* protection from abuse order that same day (the "PFA").[51] The PFA was set to expire March 15, 2018 and required the Decedent to (1) relinquish all firearms, (2) "not threaten, molest, attack, harass or commit any other act of abuse against" the Plaintiff, (3) to "stay 100 yards away from [the Plaintiff's] person, residence and workplace[,]" and (4) not to "contact or attempt to contact" the Plaintiff "in any

---

[47] Tr. 195:10–19.

[48] Tr. 192:19–24.

[49] Tr. 194:13–195:6.

[50] Tr. 71:9–24.

[51] D.I. 88 § III, ¶ 6.

9

way[.]"[52]    Through the PFA, the Family Court granted "exclusive use and possession" of the couple's residence to the Plaintiff and set a full hearing for March 15, 2018.[53]

The PFA was immediately served on the Decedent. Per the Decedent's attorney, the Decedent was shocked when the police arrived at his home to serve him.[54] The Decedent denied the Plaintiff's allegations and shared with his attorney positive interactions he recalled having with the Plaintiff the night before.[55] Nonetheless, the Decedent cooperated with law enforcement and left the marital home.

While leaving, the Decedent advised the Defendant that he should pick up the Coupe because the Decedent was being forced out of his home.[56]  The Defendant quickly worked to get title transferred, effective March 7, 2018 and on March 7 or 8, 2018, went to pick up the Coupe.[57]  By that time, the Decedent had moved out, and when the Defendant arrived, the Plaintiff would not allow the Defendant to take

---

[52] JX8.

[53] *Id.*

[54] McGroerty Dep. 18:19–20.

[55] *Id.* at 17:22–18:20.

[56] Tr. 197:4–20.

[57] Tr. 72:22–24; JX1.

the Coupe and police would not interfere to force her to do so.[58] Without cooperation or law enforcement support, the Defendant has not tried to physically obtain the Coupe again.[59]

In response to the PFA, the Decedent also retained Michael F. McGroerty as his counsel.[60] Mr. McGroerty swiftly got to work understanding the marital dispute and advising his client regarding the PFA.[61] Mr. McGroerty also advised his client to file for divorce to protect the marital assets.[62] On March 8, 2018, the Decedent took that advice and filed for divorce as a self-represented litigant.[63] In his petition, the Decedent averred that the couple had been separated "since 2016."[64] The Decedent also alleged misconduct by the Plaintiff, accusing her of removing money

---

[58] Tr. 18:4–6, 199:1–22. The Decedent had moved in with his formerly estranged daughter, Sheila Wilkins. Tr. 18:4–6. While the Decedent lived with Ms. Wilkins, they discussed the Coupe. Tr. 23:10–14. Ms. Wilkins recalled the Decedent telling her "he was selling [the Coupe] to [the Defendant] and then if something happened to [the Decedent], [the Defendant] was supposed to give [the Coupe] to the boys," meaning Ms. Wilkins' sons. Tr. 23:17–19.

[59] Tr. 200:9–12.

[60] *See* McGroerty Dep. 7:2–7.

[61] *Id.* at 9:19–10:14.

[62] *Id.* at 13:7–23.

[63] D.I. 88 § III, ¶ 7; McGroerty Dep. 19:18–20:6; JX9. This was not the first step by either side to divide their estates. On August 22, 2017, the Plaintiff replaced the Decedent as the beneficiary of her life insurance. D.I. 88 § III, ¶ 12. In response, the Decedent asked Mr. McGroerty to draft a will for him, disinheriting the Plaintiff. McGroerty Dep. 21:2–5. *See also* JX11.

[64] JX9.

11

and property from a safe, savings account, and safe deposit box.[65] In his petition, the Decedent acknowledged that the PFA rendered him unable to contact the Plaintiff or access their home.[66]

But the Decedent did not comply. Although his health continued to decline and he was in and out of the hospital, the Decedent was accused of violating the PFA multiple times.[67] Mr. McGroerty recalls making two trips to Delmar Police Department where the Decedent was arraigned for violating the PFA (on March 15, 2018 and April 5, 2018).[68] The Plaintiff also testified to a disturbing pattern of conduct that had her fleeing, staying in safe houses, and fearing for her life.[69]

But, with counsel at the table, the Decedent consented to extending the PFA until October 19, 2018.[70] The extension was granted by the Family Court "without a finding of abuse[.]"[71] The parties' agreement included a process by which the

---

[65] *Id.*

[66] *Id.* After filing for divorce, on March 12, 2018, the Decedent replaced the Plaintiff as the beneficiary of the Decedent's life insurance with Jackson National Life Insurance. D.I. 88 § III, ¶¶ 9–10; JX10.

[67] Per Mr. McGroerty the Decedent was in the hospital on and off from around March 9, 2018 through March 28, 2018 for a "severe heart problem[.]" McGroerty Dep. 8:14–24, 11:1–13, 12:11–15.

[68] McGroerty Dep. 51:3–10.

[69] Tr. 73:10–74:8.

[70] JX8.

[71] *Id.*

marital home would be appraised, and its contents inventoried.[72] The restrictions on the Decedent and the Plaintiff's sole occupancy of the home remained in place.[73]

The spouses were also able to agree on division of certain cash assets.[74] Around February 2018, after consulting with her attorney, the Plaintiff took $10,400.00 from one of the couple's safes.[75] Per Mr. McGroerty, "that money was identified from the outset by [the Decedent] as the money he had received in payment for" the Coupe from the Defendant.[76] The Plaintiff contests that was the source of funds and testified the cash was from her, "[o]r if [the couple] sold something [they] would put it in there for a nest egg."[77] After conferring, the parties agreed to spend those funds on an appraisal of their home and security devices to be installed at the home during the transition period; the remainder was to be split

---

[72] *Id.*

[73] *Id.*

[74] It appears from the Plaintiff's deposition testimony that the couple also agreed on the disposition of the Decedent's exotic birds. Anderson Dep. 51:12–18.

[75] Tr. 101:21–102:3. The Decedent, in his petition for divorce, valued the safe at $11,000.00. JX33 at 3.

[76] McGroerty Dep. 27:14–17.

[77] Tr. 63:17–19. This testimony conflicts with the Plaintiff's December 2019 deposition where she testified that she thought the cash "came from [the Decedent's] Dad's death insurance from DuPont." Anderson Dep. 56:22–57:1. Upon removal she "didn't know" where the cash came from. Anderson Dep. 58:7–9. Yet, she remains "[v]ery confident" that the cash was not from the Defendant. Anderson Dep. 81:9–11; Tr. 108:14–18, 114:9–24, 139:22–140:18.

evenly.[78]  The Plaintiff returned the funds owed to the Decedent on or around April 10, 2018.[79]

### E.    The Decedent's Death

After the PFA and title transfer, the Plaintiff moved out of the marital home and into safe houses.[80] But the Plaintiff kept an eye on the property through the agreed-upon security cameras.

On May 6, 2018, while on her way to Assateague with friends, the Plaintiff checked the home cameras and saw a distressing scene.[81] Instead of a quiet house, the Plaintiff unwittingly tuned into a house on fire and somebody trying to extinguish it.[82] Before she or her friends could call the authorities, they called her.[83]  The Plaintiff was instructed by first responders to go to the Delmar Police Department and, once at the station, she learned that the Decedent had intentionally set their house on before taking his own life.[84]

With the Decedent's death, the divorce action was rendered moot.[85]

---

[78] *See* JX19.

[79] *Id.*

[80] Tr. 73:9–74:4.

[81] Tr. 84:17–22.

[82] Tr. 84:20–23.

[83] Tr. 85:2–13.

[84] Tr. 85:19–85:18; D.I. 88 § III, ¶ 5.

[85] *See* D.I. 65.

## F.     The Court of Common Pleas Action

On May 15, 2018, nine (9) days after the Decedent's death, the Defendant filed an action against the Plaintiff in the Court of Common Pleas.[86] The Defendant alleged he purchased the Coupe for $12,000.00, which was paid in full by January 15, 2018, with title transferred March 7, 2018.[87] He averred the Plaintiff received the benefit of the purchase price yet refused to release the Coupe.[88] Thus, the Defendant sought replevin.[89] That action has, since, been dismissed without prejudice.[90]

## G.     Procedural Posture

On June 21, 2018, the Plaintiff initiated this action pleading seven (7) counts against five (5) defendants, including the Defendant.[91] Much ink has already been spilled in prior rulings and I direct interested readers to the docket for a complete posture. In short, Magistrate Griffin was able to narrow the issues in dispute before her retirement.[92] She also addressed discovery disputes and shifted certain fees in

---

[86] JX6.

[87] *Id.*

[88] *Id.*

[89] *Id.*

[90] *See* D.I. 100.

[91] D.I. 1.

[92] *See* D.I. 38, 39, 66.

favor of the Plaintiff and against the Defendant in an "amount to be determined by the Court."[93]

On November 3, 2022, Chancellor McCormick reassigned this case to me and the parties thereafter resolved nearly all of the remaining disputes.[94] I held trial on the final remaining dispute (the Coupe) on March 15, 2023.[95] Following trial, the parties submitted post-trial briefs and the Plaintiff moved for determination of the amount of the previously awarded fees.[96] Briefing was complete on August 17, 2023, at which time I took this case under advisement.[97]

## II.    ANALYSIS

Tension and turmoil aside, the singular question before me is: who owns the Coupe?[98] The Plaintiff contends the Decedent's purported sale of the Coupe constituted equitable fraud, and she seeks an order rescinding the transaction. The Defendant counters that the sale was valid, and that the Plaintiff already received her share of the sale's proceeds. Both parties also request fee-shifting.

---

[93] D.I. 56.  The Defendant did not file exceptions to Magistrate Griffin's order.

[94] D.I. 78.

[95] D.I. 93, 94.

[96] D.I. 100–102, 105–106. The Defendant has failed to respond to the fee motion, despite sufficient time and opportunity to do so.

[97] D.I. 106.

[98] The parties' pretrial stipulation included additional issues of law that remained to be litigated. D.I. 88 § V. But at trial the parties confirmed this sole remaining issue. Tr. 4:14–17. *See also* D.I. 100–102, 105–106.

I first address equitable fraud. Finding the transaction amounts to equitable fraud, I then turn to the remedy therefor and recommend rescission, without restitution. I decline, however, to declare either side a bad faith litigant and recommend only costs and the discovery fees ordered by Magistrate Griffin be shifted in the Plaintiff's favor.

## A.    The Decedent's transfer of the Coupe amounts to equitable fraud.

Throughout this action the Plaintiff has proffered various arguments in support of her count for equitable rescission.  Post-trial, she relies exclusively on one: equitable fraud.[99]  "Equitable fraud is the Chancery analog to common-law fraud."[100]  It requires proof of all the elements of common-law fraud minus scienter and plus a special relationship between the fraudulent actor and the aggrieved party.[101]  Thus, to prevail on her claim of equitable fraud, the Plaintiff needed to prove by a preponderance of the evidence: (1) she and the Decedent were in a fiduciary or confidential relationship, (2) the Decedent made a false representation, (3) the Decedent intended to induce action by that false representation, (4) there was

---

[99] Because the Plaintiff's only remaining claim is for equitable fraud, the Defendant's motivations or intentions are irrelevant. My focus, instead, is on the Decedent's conduct, as the party in a confidential relationship with the Plaintiff, the aggrieved and complaining party, who engaged in the transfer which is challenged in this action. My recommendation herein that title should return to the Plaintiff should not be read as a finding of impropriety by the Defendant.

[100] *Carpenter v. Liberty Mut. Ins. Co.*, 2023 WL 3454692, at *2 (Del. Ch. May 15, 2023).

[101] *Id.*

reasonable reliance on that false representation, and (5) the Plaintiff suffered

causally related damages.[102]

There is no reasonable dispute that the Plaintiff and the Decedent, as a married

couple, were in a fiduciary or confidential relationship when title to the Coupe was

transferred.[103]  Likewise, the Defendant concedes that the Coupe was marital

---

[102] *NetApp, Inc. v. Cinelli*, 2023 WL 4925910, at *12 (Del. Ch.), *judgment entered*, 2023 WL 5609342 (Del. Ch. Aug. 29, 2023) (citations omitted).

[103] The Defendant appears to argue that this Court is without jurisdiction to treat a marital relationship as a "special relationship" for purposes of equitable fraud because of the Family Court's jurisdiction over the division of marital property. D.I. 105, p.20–21. This argument is difficult to understand. Determining that a relationship is fiduciary is within this Court's core equitable jurisdiction. *See Totta v. CCSB Fin. Corp.*, 2022 WL 1751741, at *14 (Del. Ch.), *judgment entered*, (Del. Ch. July 18, 2022), *aff'd*, 302 A.3d 387 (Del. 2023) ("Fiduciary duties arise in equity and are a fundamental aspect of Delaware law."). And "[i]t has long been a principle of equity jurisprudence that the confidential relationship between husband and wife may implicate the standards of a fiduciary." *Angelli v. Sherway*, 560 A.2d 1028, 1036 (Del. 1989) (citations omitted). In determining whether a specific marital relationship implicates fiduciary duties, this Court undertakes a factual inquiry into the relationship at issue. Such analysis does not impede the Family Court's jurisdiction.

The Defendant further argues that *Angelli* requires one spouse to have superiority over the other for the finding of a "special relationship." D.I. 105, p.21. The Defendant misreads *Angelli* which explains "[t]he marital relationship entails fiduciary duties on the part of each spouse for the benefit of the other, particularly where one spouse is in a position of superiority to the other." *Bickling v. Bickling*, 2000 WL 268306, at *4 (Del. Ch. Feb. 14, 2000) (citing *Angelli*, 560 A.2d at 1036). Superiority is not required. The Defendant's argument also ignores the uncontested record that the Plaintiff and the Decedent lived and worked in tandem for most of their long marriage, treating all assets jointly and implicating reciprocal duties requiring each to protect that marital property for the benefit of the other.

Finally, the Defendant argues that, because the couple's marriage was unraveling, their interests were no longer "perfectly aligned" and, as such, no fiduciary relationship existed when the Coupe was transferred. In support, the Defendant cites *Zebroski v. Progressive Direct Ins. Co.*, 2014 WL 2156984, at *8 (Del. Ch. Apr. 30, 2014). This argument must fail. *Zebroski* recognizes the unextraordinary proposition that "Delaware courts . . . have been reluctant to impute the exacting principles of fiduciary relationships

property.[104] There is also no dispute that (a) the Decedent intended the Defendant to rely on the Decedent's purported authority to transfer the Coupe, (b) the Defendant reasonably relied on such purported authority,[105] and (c) the Plaintiff suffered causally related damages when title was transferred out of her name and into the Defendant's name.

That leaves (2)—whether the Decedent's representations that he had authority to transfer the Coupe were false. Put differently, the Plaintiff's claim for equitable fraud turns on whether the Decedent could validly transfer the Coupe without the Plaintiff's consent. I find he could not, thus, his representations to the contrary were false and the transaction amounts to equitable fraud.[106]

"In Delaware, personal property may be held by the entireties and such an estate prevents severance by the independent acts of one spouse."[107] To determine

---

to those engaged in normal commercial dealings." *Id.* It does not set a new standard where a fiduciary relationship only exists where the parties' interests are "perfectly aligned."

[104] D.I. 105 p.23 ("There is no dispute that [the Coupe] was marital property in this case.").

[105] "[J]ustifiable reliance requires that the representations relied upon involve matters which a reasonable person would consider important in determining his course of action in the transaction in question." *Craft v. Bariglio*, 1984 WL 8207, at *8 (Del. Ch. Mar. 1, 1984). A lay person may justifiably rely on the representation that an "and/or" co-owner has authority to sale or transfer title (notwithstanding common law to the contrary).

[106] Equitable fraud further requires that the misrepresentation be material. *Williams v. White Oak Builders, Inc.*, 2006 WL 1668348, at *7 (Del. Ch. June 6, 2006). Purported authority to transfer ownership is undoubtedly material to a sale contract.

[107] *William M. Young Co. v. Tri-Mar Assocs., Inc.*, 362 A.2d 214, 215 (Del. Super. 1976).

if property is held by the entireties, the couple's intent controls, "not necessarily language of the title of ownership."[108]  But "the presence of both husband and wife on [a] title is sufficient to create a presumption that [a] vehicle is held by the entireties."[109]  To overcome the presumption of joint ownership by the entireties, the contesting party, here the Defendant, must present "relevant and probative evidence to the contrary."[110]

In *Fischer*, Chancellor Chandler demonstrated how to apply this presumption and burden shift in the vehicular context.[111]  There, a married couple owned three cars titled "AND/OR."  The Chancellor explained "[n]otwithstanding that th[e] '& OR' designation may be the standard designation of the Delaware Department of Motor Vehicles, the presence of both husband and wife on the title is sufficient to create a presumption that the vehicle is held by the entireties."[112]  Thus, the Chancellor applied the presumption and held the parties contesting ownership by the entireties to their burden to prove otherwise.[113]

---

[108] *Id.* at 216.

[109] *Fischer v. Fischer*, 864 A.2d 98, 105 (Del. Ch.) (citing *William M. Young Co.*, 362 A.2d at 215–16; *In re Giant Portland Cement Co.*, 21 A.2d 697, 704 (Del. Ch. 1941)), *judgment entered*, 2005 WL 5783304 (Del. Ch. Mar. 8, 2005).

[110] *Fischer*, 864 A.2d at 105.

[111] *Id.*

[112] *Id.*

[113] They failed to meet it. *Id.* at 105–106.

The reasoning in *In re Giant Portland Cement Co.* is also instructive.[114] Therein, a proxy was rejected because it was only signed by the husband, who jointly owned the voting stock with his wife. The Chancellor held that "the same general rules" applicable to real property held by the entireties "also apply to personal property" held by the entireties.[115] Although the stock certificate at issue merely noted both co-owners and did not describe the ownership as by the entireties, the Chancellor found the co-owners must be regarded as holding the stock by the entireties.[116] As such, "the stock in question could not be voted on a proxy signed merely by [the husband]. Both husband and wife, but neither of them alone, were stockholders in and members of the defendant corporation. Both were entitled to exercise and enjoy jointly, but not otherwise, all of the usual rights and powers incident to stock ownership[.]"[117]

The same reasoning applies here, where I follow the lead of *Fischer*. Although the Coupe was titled "AND/OR," both the Plaintiff and the Decedent, a

---

[114] 21 A.2d 697 (Del. Ch. 1941).

[115] *Id.* at 703.

[116] *Id.*

[117] *Id.* at 704. The Court's conclusion that the husband could not act alone to vote was abrogated by 8 *Del. C.* § 217, which permits one co-owner of jointly owned stock, even stock held by the entities, "to bind all co-owners with his vote unless the corporation has received prior written notice to the contrary." *Hopkins v. Hopkins*, 1982 WL 116991, at *3 (Del. Ch. Sept. 21, 1982). This modification of common law does not, however, undermine the apt and persuasive reasoning in *In re Giant*.

married couple, were named on the Original Title, supporting the presumption that the Coupe was held by the entireties. That presumption flips the burden to the Defendant to prove otherwise. He failed to do so.

The Defendant argues, without citation, that "[t]he fact that the car was titled 'and/or' gave either [spouse] authority to sell the vehicle."[118] *In re Giant* and *Fischer* instruct otherwise. The Defendant also appears to argue that, regardless of how the sale was initially conducted, the cash division—accomplished by the couple during the divorce proceeding—somehow cures the issue. It does not. The Decedent never had sole authority to sell the Coupe and the Defendant conceded that the Plaintiff was not aware of the transaction. There is also no evidence that the Plaintiff ratified, acquiesced to, or waived her ability to contest the transaction. The Plaintiff has been steadfast in her opposition to the transaction and never conceded, overtly or implicitly, that the cash divided during the divorce proceeding came from, in whole or part, the Defendant's purported purchase. I find the Decedent's purported transfer of the Coupe to the Defendant amounts to equitable fraud.

**B. The transfer of title to the Defendant should be rescinded.**

To remedy the Decedent's equitable fraud, the transfer to the Defendant should be rescinded such that title to the Coupe is returned to the Plaintiff.

---

[118] D.I. 105, p.23.

A defrauded party, generally, has two options. She "may elect to affirm the challenged contract and seek money damages" in an action at law.[119] Or, she "may elect to disaffirm the contract and be restored to the status quo ante" through equitable rescission.[120] Here, the Plaintiff elected, and I find should prevail on, option two.

"Equitable rescission . . . which is otherwise known as cancellation, is a form of remedy in which, in addition to a judicial declaration that a contract is invalid and a judicial award of money or property to restore plaintiff to [her] original condition is made, further equitable relief is required."[121] "[T]he remedy of equitable recission typically requires that the court cause an instrument, document, obligation or other matter affecting plaintiff's rights and/or liabilities to be set aside and annulled, thus restoring plaintiff to [her] original position and reestablishing title or recovering possession of property."[122]

---

[119] *Clark v. Teeven Hldg. Co., Inc.*, 625 A.2d 869, 877 (Del. Ch. 1992) (citations omitted).
[120] *Id.*

[121] *E.I. Du Pont De Nemours & Co. v. HEM Rsch., Inc.*, 1989 WL 122053, at *3 (Del. Ch. Oct. 13, 1989). Equitable rescission is distinct from rescission that may be sought in a court of law. *Id.* Equity "is necessitated, for example, in circumstances in which if an instrument, document, obligation, or other matter were not cancelled, plaintiff would be exposed to liability to third parties not appearing in the action." *Id.* For example, "[i]f plaintiff is fraudulently induced to execute a note in favor of defendant, the only remedy that is adequate for plaintiff is cancellation of the note to ensure that defendant does not transfer the note to a bona fide purchaser, who could then recover from plaintiff under the note." *Id.* (citations omitted). Equity is necessary here.

[122] *Id.*

Here, equitable recission is appropriate and necessary to restore the status quo. The Decedent's unauthorized transfer of the Coupe to the Defendant fraudulently deprived the Plaintiff of her interest therein. To remedy that harm and reestablish the status quo, the transfer should be rescinded and title to the Coupe should be returned to the Plaintiff.

The more difficult question is whether recission of title should be accompanied by restitution to the Defendant. In *Craft v. Bariglio*, Chancellor Brown emphasized "that rescission will not be granted unless the Court can and does, by its decree, restore the parties substantially to the position which they occupied before making the contract."[123] In doing so, this Court endeavors to equitably restore both sides to the status quo.[124]

But, here, the Plaintiff argues the Defendant waived any argument for restitution or, alternatively, failed to prove that he paid the Decedent any cognizable funds for the Coupe such that restitution is warranted. In post-trial briefing, the Defendant failed to address or request restitution, and failed to respond to the Plaintiff's waiver argument. Despite sufficient opportunity (and invitation) to do so,

---

[123] *Craft v. Bariglio*, 1984 WL 8207, at *12.
[124] *Id.*

the Defendant has failed to move for restitution and I am forced to conclude that the Defendant waived any argument therefor.[125]

It would, however, be inequitable to deny the Plaintiff rescission because of the Defendant's waiver. The Plaintiff has proven her claim of equitable fraud and otherwise demonstrated the need for equitable rescission. That the Defendant has failed to argue for reciprocal restitution should not bar such relief. Thus, I recommend the transaction be rescinded, without restitution.

### C. Attorneys' fees should not be shifted under the bad-faith exception, but discovery-related fees and costs should be shifted in the Plaintiff's favor.

Both sides seek fees under the bad faith exception to the American rule. The Plaintiff also seeks a determination of the amount of fees owed to her from Magistrate Griffin's 2020 discovery ruling. I find no evidence of bad faith but

---

[125] *See, e.g.*, *In re Mindbody, Inc., S'holder Litig.*, 2023 WL 7704774, at *6 (Del. Ch.), *judgment entered*, 2023 WL 8235846 (Del. Ch. Nov. 27, 2023) (finding certain defendants waived specific arguments "by failing to take minimal steps to preserve them").

Waiver aside, the Defendant failed to present persuasive evidence that he paid any specific funds to the Decedent to purchase the Coupe. The Defendant's testimony was difficult to believe considering the shifting payment schedule and documentation (and admissions) that the Defendant was struggling financially at the time the large payments were purportedly made. Absent waiver, the evidence does not support a finding that the Defendant more likely than not paid $12,000.00 to the Decedent such that the Plaintiff should be required to return such sum, or any portion of it, in connection with the rescission of title recommended herein.

recommend that the Plaintiff be awarded costs in addition to the previously ordered and herein determined discovery-related fees.

"Under the American Rule, litigants are expected to bear their own costs of litigation absent some special circumstances that warrant a shifting of attorneys' fees, which, in equity, may be awarded at the discretion of the court."[126] "The bad faith exception to the American Rule applies in cases where the court finds litigation to have been brought in bad faith or finds that a party conducted the litigation process itself in bad faith, thereby unjustifiably increasing the costs of litigation."[127]

"A party seeking to shift fees must satisfy the stringent evidentiary burden of producing clear evidence of bad faith."[128] "To capture the sorts of vexatious activities that the bad-faith exception is intended to address, this court employs the 'glaring egregiousness' standard."[129] Here, neither side has met the stringent burden to prove glaringly egregious conduct.

The Plaintiff argues that the Defendant proceeded with this case "[n]otwithstanding the overwhelming amount of evidence against him, without any

---

[126] *Beck v. Atl. Coast PLC*, 868 A.2d 840, 850–51 (Del. Ch. 2005) (citations omitted).

[127] *Id.*

[128] *Myers v. Acad. Sec., Inc.*, 2023 WL 6380449, at *1 (Del. Ch. Oct. 2, 2023), *adopted*, 2023 WL 6846984 (Del. Ch. Oct. 16, 2023) (citations and quotation marks omitted).

[129] *Seidman v. Blue Foundry Bancorp*, 2023 WL 4503948, at *6 (Del. Ch. July 7, 2023) (citations omitted).

evidence or documentation whatsoever, and with overwhelming dis-favorable caselaw" amounting to a waste of the parties' and the Court's time and resources.[130] Although I herein recommend judgment in favor of the Plaintiff, I disagree that the Defendant litigated in bad faith.

From the Defendant's vantage, it is the Plaintiff who engaged in bad faith litigation. Per the Defendant, the Plaintiff "needlessly drove up the costs of this litigation beyond any reasonable proportion to the value of" the Coupe to construct "an alternate reality to portray" the Decedent in a negative light.[131] I herein find in the Plaintiff's favor and find no bad faith in her pursuant of the equitable relief awarded herein.

All told neither side's conduct was glaringly egregious. But, under Court of Chancery Rule 54(d), "costs shall be allowed as of course to the prevailing party unless the Court otherwise directs." The Plaintiff is the prevailing party and I find costs should be shifted in the Plaintiff's favor. Further, Magistrate Griffin already awarded fees in connection with the Plaintiff's 2020 motion to compel. I find the Plaintiff's request for fees of $410.00 be granted as reasonable and unopposed.

---

[130] D.I. 100, p.21.
[131] D.I. 102, p.11–13.

## III. CONCLUSION

For the foregoing reasons, I find the Plaintiff has proven her claim for equitable fraud and, to remedy that fraud, I recommend equitable recission of the transfer of the Original Title to the Defendant. Title to the Coupe should revert to the Plaintiff. Further, fees in the amount of $410.00 and costs for this action should be shifted in the Plaintiff's favor. The parties shall submit a proposed form of implementing order within ten (10) days of this becoming a final order of the Court.

This is my final report and exceptions may be filed under Court of Chancery Rule 144.